[Civil No. 2428.   Filed June 30, 1925.]

[237 Pac. 636.]

GEORGE DAY, Appellant, v. BUCKEYE WATER CONSERVATION AND DRAINAGE DISTRICT and J. G. SCHWEIKART, A. F. LAFFERTY and S. LESLIE NARRAMORE, Constituting the Board of Directors of the BUCKEYE WATER CONSERVATION AND DRAINAGE DISTRICT, Appellees.

1. WATERS AND WATERCOURSES — IRRIGATION DISTRICT HELD NOT "OTHER SUBDIVISION OF STATE," UNDER CONSTITUTION, AS TO LOANS OF CREDIT.—Irrigation district, organized under Laws of 1921, chapter 149, as modified by Laws of 1922 (Sp. Sess.), chapter 6, proposing bond issue to acquire water rights from canal company

owning irrigation works, *held* not an "other subdivision of state," within Constitution, article 9, section 7, forbidding loans of credit, etc.

2. WATERS AND WATERCOURSES — CONTRACT OF IRRIGATION DISTRICT WITH CANAL COMPANY HELD TO CREATE VESTED RIGHT IN NATURE OF EASEMENT.—Where canal company owned no irrigable lands so that it could own none of water which it delivered, agreement of irrigation district with it for diversion and delivery of water for all lands within district, so far as possible, *held* to create vested right in the canal appurtenant to lands of district in nature of an easement, in view of Laws of 1921, chapter 149, section 5 (a).

3. EASEMENTS—REQUISITES STATED; "EASEMENT."—An "easement" is property, the qualities of which are that it be incorporeal, imposed upon corporeal property and not upon the owner of it, that it confer no right to participation in profits arising from such property, and that it be imposed for benefit of corporeal property, attached to a dominant tenement, and placed upon a servient tenement.

4. WATERS AND WATERCOURSES—IRRIGATION DISTRICT MAY PURCHASE CONTRACT RIGHT FROM CANAL COMPANY IN NATURE OF EASEMENT. Although Laws of 1921, chapter 149, as modified by Laws of 1922 (Sp. Sess.), chapter 6, may not permit issue of bonds by irrigation district for purchase of mere promise of another to deliver water, district *held* entitled to contract with canal company for delivery of all irrigation water it could legally divert and carry, which would result in water right in irrigation district, equivalent to an easement.

5. WATERS AND WATERCOURSES — CONTRACT OF IRRIGATION DISTRICT, WITH BOARD OF DIRECTORS OF CANAL COMPANY SELLING ASSETS, HELD SUFFICIENTLY AUTHORIZED BY STOCKHOLDERS.—Where petition for organization of irrigation district stated that water was to be acquired from canal company by purchase of stock or contract, and was signed by majority of landholders in district and stockholders in company, and contract with canal company for water with option to purchase company's assets was made basis of bond issue submitted to landholders in district, including every stockholder in company, and issue was approved by majority of more than four to one, board of directors *held* sufficiently authorized to make contract, under Civil Code of 1913, paragraph 2107, subdivision 4, and Laws of 1922 (Sp. Sess.), chapter 6, section 1, without specific vote of stockholders.

6. WATERS AND WATERCOURSES—STATUTES, REQUIRING FILING OF MAP AND LIST OF TRACTS IN IRRIGATION DISTRICT WITH SUPERVISORS, SUFFICIENTLY COMPLIED WITH.—Where, before submission of bond

---

3.  See 4 R. C. L. 735.

issue to voters of irrigation district, Laws of 1921, chapter 149, section 11 (a), as amended by Laws of 1922, chapter 36, section 1, was complied with, but bond issue was defeated, statutes *held* not to require filing of new map or list of lands with supervisors, and hearing thereon before submission of second proposed bond issue, in view of section 11 (b).

7. WATERS AND WATERCOURSES — LAND, IN LIST FILED WITH SUPERVISORS ON SUBMISSION OF BOND ISSUE FOR IRRIGATION DISTRICT, SUFFICIENTLY DESCRIBED. — Although, before submission of bond issue of irrigation district, list of included tracts, required to be filed with supervisors, under Laws of 1921, chapter 149, section 11 (a), as amended by Laws of 1922, chapter 36, section 1, did not describe some of parcels of land with technical accuracy, where map accompanying list did, bond issue *held* not invalid.

See (1) 40 Cyc., p. 817, n. 84 New, p. 821, n. 19, p. 831, n. 19. (2) 40 Cyc., p. 821, n. 23 New. (3) 19 C. J., p. 864, n. 23, 24, 25, 26, 27. (4) 40 Cyc., p. 821, n. 23 New. (5) 14 C. J., p. 866, n. 47. (6) 40 Cyc., p. 822, n. 34 New. (7) 40 Cyc., p. 821, n. 25.

APPEAL from a judgment of the Superior Court of the County of Maricopa. Dudley W. Windes, Judge. Affirmed.

Mr. Frank J. Duffy, for Appellant.

Messrs. Kibbey, Bennett, Gust, Smith & Lyman, for Appellees.

LOCKWOOD, J.—The Buckeye Irrigation Company, a corporation, is now and long has been the owner of an irrigation system, consisting of diversion works in the Gila River below the mouth of the Agua Fria and a canal system extending in a general westerly direction therefrom.

For many years some 16,000 acres of land have been irrigated from this canal. Under the articles of incorporation of the Company, each shareholder must own an acre of land for every share of stock he holds, and the stock is inseparably attached to the particular land served.

In the year 1922, a number of the stockholders desired to organize an irrigation and drainage district, for the purpose of improving their diversion and drainage works and the additional purpose of rounding out the project by including some 6,000 acres of land irrigable from the Buckeye Canal, but which was not at the time represented by stock in the canal, or receiving water therefrom. The district was duly organized according to law under the provisions of chapter 149 of the Session Laws of 1921, as modified by chapter 6 of the Session Laws of 1922 (Sp. Sess.), which last was apparently passed with this particular situation in view, taking the name of Buckeye Water Conservation & Drainage District. Hereinafter in this opinion the Buckeye Irrigation Company will be called the Company and the Buckeye Water Conservation & Drainage District will be called the District.

On the 13th of October, 1923, the board of directors of the District and the Company entered into a certain agreement. It is extremely lengthy and we will not set it forth in full, but the substantial provisions are as follows: After reciting the facts that the District was organized to provide irrigation and drainage facilities for the land therein, and that the Company owned an irrigation system for the purpose of irrigating the 16,000 acres of land above referred to, with its capital stock appurtenant to the land, and that the District was organized for the purpose of irrigating all the land therein owned by the shareholders of the Company as well as the nonshareholders, it further states that it was necessary that the District acquire the use of the Company's irrigation and drainage work and improve the same. It proceeds to estimate the value of the Company's property at some $600,000 and the total cost of improving the same and purchasing it from the Company by the

District at $1,600,000 stating it was not advisable to attempt to issue district bonds to that extent for purchasing the system as well as improving the same. It was then mutually agreed: First, that the District would, if possible, issue $1,000,000 worth of bonds, for the purpose of making the necessary improvements on the Company's property; second, that, if and when the bonds were issued, the improvements should be made on said property in accordance with a determined plan under the direction of both the Company and the District, and paid for out of the bond issue of the District; that the Company's indebtedness, then amounting to over $110,000, should also be paid therefrom, and the property of the Company as it existed at the commencement of said improvements be valued in a certain manner. The Company agreed, in return for this large expenditure of money, to divert from the Gila River all the water it could legally take for the irrigation of the land of the District, giving all the land therein equal service so far as it legally could. It further agreed to issue to all the owners of land who were not already stockholders, on their application therefor, stock to represent their land without further payment; it being agreed that the payment by the District above set forth was payment for the stock. The title to all of this property was to remain in the Company until the happening of one of several contingencies, with the proviso that, under any circumstances if the District took the title, it must pay for the property its appraised value, plus 8 per cent compound interest. The District further agreed to raise by taxation each year an amount sufficient to take care of its running expenses and its bonds, and in addition thereto 8 per cent interest on the estimated value of the Company for distribution among its original shareholders. Thereupon the District proceeded to adopt the plan in said contract as its general plan of proposed work

under the law and file with the board of supervisors
a map and list as provided by section 11(a), chapter
149, Session Laws of 1921, and secured from the state
certification board an approval of the bond issue and
the plans.   Thereafter said bond issue was duly sub-
mitted to the voters of the District, and was defeated,
whereupon the board of directors declared the result
of the election in accordance with section 11(b), chap-
ter 149, Session Laws of 1921.

On the 7th of October, 1924, the District and the
Company entered into a supplementary agreement
which was, in substance, as follows: After reciting
the failure of the previous bond issue and a second
attempt by the District to submit a modified proposi-
tion which had never been carried to completion, and
a mass meeting of the land owners of the District
which approved a bond issue of $200,000, it was
agreed that the District should submit the bond issue
for $200,000, which money should be used for opening
up a new canal to make more safe the then existing
head of the Company's system, and to pay some
$100,000 of the Company's bonds, and that in return
therefor the Company would carry water for the irri-
gation of all the District lands through its system
as far as possible, but would not grant the same rates
to nonshareholders as to shareholders.   It further
provided that the District might still buy the Com-
pany property at the appraised value, and that any
time within five years from the date of the supple-
mental contract the Company might request the Dis-
trict to proceed under the original agreement and it
would do so.

Thereafter the District postponed the adoption of
the original general plans and set up a new general
plan in accordance with the supplemental agreement.
No new survey map, or list, was made, and filed with
the supervisors, but the state board of certification
approved the new plan and the proposed bond issue

of $200,000, which was duly submitted to the electors of the District, and carried. Thereafter the bonds were advertised for sale and awarded to the First Securities Company of Los Angeles as the highest and best bidder, but before their delivery plaintiff herein, being the owner of land within the District not represented by stock in the Company, brought suit to enjoin the issuance of the bonds. He raises five objections to their validity, which we will consider as seems advisable.

The first and most serious objection is that the contracts and general plans above referred to violate provisions of section 7, article 9, of the state Constitution, which reads as follows:

"Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the state by operation or provision of law."

It must be conceded that, if the District is an "other subdivision of the state" within the meaning of section 7, *supra,* the bond issue is unconstitutional. It is inseparably united with a contract which provides for the purchase of stock in a private corporation with the funds of the District and its donation to individuals. Such a contract is plainly prohibited by the Constitution. But is the District such a "subdivision"? It is true that in *Kinne* v. *Burgess,* 24 Ariz. 463, 211 Pac. 573, we held an electrical district to be a political subdivision of the state within section 13, article 7, of the Constitution, and it is doubtless true that an irrigation district is also such a subdivision within the same section, and for the

same reasons. Bond issues of any such district must be approved by the property taxpayers whose property is subject to the lien of the bonds.

We did not, however, pass upon the question raised herein, and it does not necessarily follow that either an electrical or irrigation district is within the term of section 7, *supra.* Constitutional limitations are necessarily broad and general in their terms, and must be construed in view of the surrounding circumstances and the evils they were designed to meet rather than according to the strict rules of interpretation of penal codes and contracts. This or a similar provision is found in the Constitution of nearly every state in the Union, and is the outgrowth of a situation extremely prevalent in the last half of the nineteenth century. As was well said by the Supreme Court of Montana in *Thaanum* v. *Bynum Irr. Dist. et al.,* 72 Mont. 221, 232 Pac. 528, in construing a constitutional provision almost *verbatim* like ours, and its application to the purchase by an irrigation district of shares of stock in private water companies:

"It represents the reaction of public opinion to the orgies of extravagant dissipation of public funds by counties, townships, cities, and towns in aid of the construction of railways, canals, and other like undertakings during the half century preceding 1880, and it was designed primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to *quasi*-public purposes, but actually engaged in private business. Although an irrigation district is authorized to levy taxes upon the lands included in the district for the purpose of raising funds to discharge any indebtedness incurred· in purchasing or constructing an irrigating system and in maintaining such system, the taxes so imposed are in the nature of special assessments, as distinguished from general taxes. . . . "

The rule of *ejusdem generis* has been applied by this court, as well as by others, repeatedly, and is

recognized as one of the cardinal principles of statutory and constitutional construction. Counties, cities, towns, and municipalities all belong to a class of subdivisions of the state primarily established for what are commonly called political and governmental, as aside from business purposes. Any exercise of the latter function is merely incidental to their existence and in no way necessary for it. And in the past, and particularly when it took one of the forms prohibited by the section in question, such exercise has generally resulted so disastrously to the public that the wisdom and purpose of the constitutional provision as applied to such subdivisions is plain. On the other hand, irrigation districts and similar public corporations, while in some senses subdivisions of the state, are in a very different class. Their function is purely business and economic, and not political and governmental. They are formed in each case by the direct act of those whose business and property will be affected, and for the express purpose of engaging in some form of business, and not of government. The power of incurring obligations of any nature is ultimately left in the hands of those whose property is affected thereby. In many cases the only way in which they can carry out the sole purpose of their existence is by some plan of joint control or ownership forbidden by section 7, *supra.* To hold that they belong to the ''other subdivisions of the state'' referred to in that section would be in effect to prohibit their existence. *Beasley* v. *Assets Conservation Co.,* 131 Wash. 439, 230 Pac. 411–413; *In re Riverside Irrigation Dist.,* 129 Wash. 627, 225 Pac. 636.

We are satisfied that irrigation districts are not, both under the rule of *ejusdem generis* and the general history and purpose of this and similar constitutional provisions, ''other subdivisions of the state'' within section 7, article 9, of the Constitution. *Thaanum* v. *Bynum Irr. Dist., supra.*

The second point raised is that the statutes governing irrigation districts in Arizona do not permit a contract of the nature of the ones herein, on which the bonds in this case are based. It is claimed our statutes are modeled on the famous Wright Law of California (Stats. 1887, p. 29), and it has been held repeatedly there that the law contemplates only the construction or acquisition by purchase or condemnation of an irrigation system, which shall be the property of the district and under its control, and that bonds cannot be issued by the district to pay for the mere promise of another to deliver water to the district, such as it is contended the contract involved herein amounts to. *Stimson* v. *Alessandro Irr. Dist.,* 135 Cal. 389, 67 Pac. 496, 1034; *Rialto Irr. Dist.* v. *Stowell,* 246 Fed. 294, 159 C. C. A. 24; *Leeman* v. *Perris Irr. Dist.,* 140 Cal. 540, 74 Pac. 24.

In the Stimson case the court says:

"From the foregoing it is quite apparent that the purpose of the Wright Act is to enable an irrigation district to construct, or acquire by purchase or condemnation, or by all of said methods combined, when necessary, a system of canals and waterworks which shall be the property of the district and under its control; that the board of directors have power to acquire °such waterworks in the manner aforesaid, and to issue the bonds of the district in payment therefor; and that the board has no other powers except those which are expressly given or are implied as necessary to carry out the main purpose of the act. And it is clear that where, as in the case at bar, a board has taken no steps whatever towards complying with the statute by constructing or acquiring, or commencing or undertaking to construct or acquire, any system of canals or waterworks whatever, it has no power to give all the bonds of the district for a mere personal promise of another that he will in the future lease some water to the district at a stipulated rent."

Our court has stated in the case of *In re Auxiliary Eastern Canal Irr. Dist.*, 24 Ariz. 163, 207 Pac. 614:

"The enactments by the Legislature of Arizona, in 1915 and in 1921, as we understand, are in all essential features like the Wright Law as amended from time to time, and the laws of the other named states. In fact, it is certain such laws were used as a guide in the drafting of ours."

The California decisions are therefore, while not necessarily binding, very persuasive.

Counsel for appellee in their briefs, state:

"The examination of the abstract of record in the Auxiliary Eastern Irrigation District Case will disclose that the agreement between said District and the Salt River Valley Water Users' Association, expressly approved by this court in that case, was fully as vulnerable to this assignment of error as are the contracts attacked by appellant in this case. In our opinion, this assignment of error is foreclosed by said case."

It does not appear from the opinion in the Auxiliary Eastern case that the Stimson case, or any of the others following it in California, were ever called to the attention of this court at the time we decided the former case. In fact, counsel for appellant therein says in his brief:

"What the District is to obtain from its contribution is a contractual right to enjoy the benefits derived from such construction in the operation of its pumping plants for the term of years that shall be provided in the contract.

"The court found as a matter of law that such contract was authorized as within the purposes of the organization of the District and for which said issue of bonds has been authorized. Upon this point the appellant is able to cite no authority which throws light upon the question."

Appellee did not even trouble to file a brief. This incident is an excellent example of the evils of the so-called "confirmation proceedings." Bonds are is-

sued and sold, subject to the approval of the buyer. His attorneys suggest that, while they may be and probably are legal, an O. K. from the Supreme Court will furnish a guaranty of validity which will overcome certain doubts which have suggested themselves. A case is hurriedly prepared, in which, while there are nominally a plaintiff and a defendant, yet as a matter of fact one party is as anxious the bonds be upheld as the other. The matter is rushed through the superior court on what is practically an agreed judgment, and generally handed to this court just as the summer season is started, with a plea for immediate determination on the ground of urgent public interests. In some cases only one brief is presented, and, if two happen to be filed, they frequently bear evidence of having been prepared in collaboration, or by the same party. We do not mean for a moment that counsel deliberately conspire to deceive the court, but it is only natural and human that the possible defects of the issue will not be as thoroughly briefed as in a really contested case. This court naturally relies on the parties to an action to brief and discuss fully all of the issues involved, and, if they do not present them, a busy appellate tribunal may at times fail to perform the duties of the attorneys. The contract in the Auxiliary Eastern case contains a clause similar to the one which the Supreme Court of California found fatal in the Stimson case, and which also exists in the case at bar, viz., the payment of the proceeds of the bonds of the District for what is claimed to be a mere promise of delivery of water, with no interest in any property acquired thereby, yet counsel stated that no case could be found throwing light on the question. We must therefore .reconsider the question presented in the light of the Stimson case and the authorities which follow it, as well as the decision in the Auxiliary Eastern case.

The provision of the incident agreement, which it is contended brings it within the rules of the Stimson case reads as follows:

"The Company covenants and agrees that . . . it will, by the use of its existing irrigation system and works, and such additions and improvements as may be made thereto . . . divert from the Gila river and carry in its canals and laterals, for the benefit of each tract of land included within the District, any and all irrigation water it may be able to so legally divert and carry."

If this be nothing more than a mere personal contract to deliver water for a certain rental price, established or to be established, the Stimson case is indeed well in point. To our minds, however, it seems to be much more than such a contract. Under the law of Arizona a canal company like the one in question, which owns no irrigable lands, owns and can own none of the water which it agrees to deliver, nor has it even the right to use the same. The ownership is in the state, and the right of use in the land to which it is beneficially applied. This right of use is appurtenant to the land. It cannot be divorced therefrom and exist, and it passes with the land when the latter is conveyed without even a mention thereof. When the right to the use of water has once attached to a piece of land lying under a canal, a canal company which has been in the habit of supplying non-shareholders can be compelled to carry such water as a common carrier so long as it has the physical capacity in its canal so to do, after its own shareholders have been properly supplied, with the privilege, of course, of making a reasonable charge therefor. If, however, its carrying capacity is fully taken up by its own shareholders, it is not under obligation, in the absence of contract, to do such carrying. *Slosser* v. *Salt River Valley Canal Co.,* 7 Ariz. 376, 65 Pac. 332.

Under a contract such as this, however, it seems to us there is a vested right in all the lands of the District to the perpetual use of the canal for the purpose of carrying the water to which they may be entitled by law. The excuse cannot be offered by the Company in favor of shareholders as against nonshareholders, that the canal cannot carry water for both, and the latter must do without. If there is water for both in the river, but enough cannot be carried by the canal to supply shareholders and nonshareholders, the shareholders, as such, hold their rights subordinate to that of the District lands, and must depend, under such circumstances, on their rights of carriage as district land owners, and not as shareholders in the canal. An interest of this nature partakes far more of the qualities of an easement than that of a mere contract. The essential qualities of easements as enumerated by all the authorities are; First, they are incorporeal; second, they are imposed upon corporeal property and not upon the owner of it; third, they confer no right to a participation in the profits arising from such property; fourth, they are imposed for the benefit of corporeal property; fifth, there must be two distinct tenements, a dominant, to which the right belongs, and a servient, upon which the obligation is imposed. 19 C. J. 864.

We think the contract in question, properly interpreted, clearly contains every requirement of an easement. The right is certainly incorporeal. The obligation is not personal, but will follow the canal owned and operated by the Company, no matter whose hands it may pass into. There are no rights of participation in any profits of the Canal Company granted by the clause in question. These rights are imposed, not for the benefit of any particular individual, but for that of certain specified lands situated under the canal, and there are two distinct tenements. While this point is not discussed in full in the Auxiliary Eastern

case, yet it is clear from the reading thereof we considered the right acquired therein, which is very similar in nature to the one in this case, as being, as we say, "certain rights or easements" rather than a mere personal contract. An easement, of course, is property. Section 5 (a), chapter 149, Session Laws of 1921, says:

"To accomplish the purpose of the District as proposed by the petition submitted for the formation thereof, the board shall have power to purchase or acquire water rights, acquire or lease real and personal property, when necessary for its purposes, to acquire and hold stock in irrigation ditch and reservoir companies and to lease, sell and otherwise dispose of real estate and personal property, to construct, acquire, purchase, any and all canals, ditches, reservoirs, reservoir sites, water, water rights, rights of way, or other property by it deemed necessary for the use of the District. . . . "

When bonds are issued, the board of directors of the District "shall by a resolution entered on its record adopt a general plan of its proposed works, which resolution shall state in a general way what works or property it is proposed to lease, purchase, or acquire, . . . and the estimated cost for carrying out said plan and how it is proposed to raise the necessary fund therefor. . . . " We are of the opinion that the easement to be acquired by the District, under the plan as aforesaid, was within the scope of the authority given it under the irrigation law.

The third point raised is that the contracts in question were approved on the part of the Company by the board of directors thereof, and not by the stockholders, and that, since both contracts herein give an option of purchase of the entire assets of the corporation, the action of the board of directors of the Company was *ultra vires.* Admittedly at com-

mon law neither the board of directors nor a majority of the shareholders of a going, solvent corporation had power to sell all its assets, against the will of a single stockholder. 14 C. J. 866.

In Arizona, however, under the provisions of subdivision 4, paragraph 2107, R. S. A. 1913 (Civil Code), the board of directors of private corporations like the Company herein may dispose of its assets, when authorized so to do by a majority of the stockholders at any general or special meeting. Section 1 of chapter 6, Session Laws Special Sess. 1922, further provides for the inclusion within an irrigation district of lands receiving water from irrigation works "owned by a number of land owners, or an association of land owners, or a corporation in which the stock is owned and held by such land owners with the assent of a majority of such land owners or members of such association or stockholders."

It appears from the record herein that, in the petition for the organization of the District, it was specifically stated that the means proposed for irrigating the lands therein involved the acquisition of the right to use the property of the Company, either by purchase of stock or by contract. This petition was signed by a majority of the stockholders in the Company, as well as a majority of the landholders of the District. While, of course, this was not a meeting of the stockholders, yet, taken into consideration with the fact that after the organization of the District the particular contract complained of herein was made the basis for the bonds in question, and the latter were submitted to the landholders of the District, among whom were necessarily included every stockholder in the Company, and approved by a majority of more than four to one, we think the action of the board of directors of the Company was authorized generally in advance of, and approved specifically

28 Ariz.—31

after, the making of the contract, by a majority of the stockholders of the Company, and the action of the board was not *ultra vires.*

The next objection is that the board of directors of the District did not comply with the requirements of section 11(a) of chapter 149, Session Laws 1921, as amended by chapter 36, Session Laws Special Sess. 1922, before the submission of the issue herein to the voters of the District. It is admitted this section was meticulously followed before the submission of the $1,000,000 bond issue, which was defeated, but it appears that, when the present issue was submitted, no new map or list was filed with the supervisors, nor was any hearing had thereon. The remainder of the proceeding was admittedly regular.

On an examination of section 11(a), *supra,* it appears that the only purpose of filing the map and list provided therein with the supervisors, and the hearing designated to be held before them, is to determine whether or not any of the land which is to bear the costs of the proposed work is incapable of irrigation by the plan proposed. The only action which the board of supervisors can take is:

"Upon its appearing that any parcels so listed are not by reason of the location or character thereof susceptible of irrigation from said proposed works, the board may, in its discretion, exclude such parcel or parcels."

Section 11(b) of the same act provides that—

If the first proposed bond issue is defeated, "the result of such election shall be so declared and entered of record and whenever thereafter the said board deems it for the best interest of the district that bonds be issued for district purposes and that the question of the issuance thereof shall be submitted to said electors, the board shall adopt resolutions and record the same in its minutes and may thereupon submit such question to said electors in the same

manner and with like effect as at such previous election.''

This section does not expressly require a new hearing before the supervisors, or that a new map and list be filed, and taking into consideration the only purpose of the hearing as shown by section 11(a), *supra,* unless the plan of irrigation is so changed that some of the land originally included is not susceptible of irrigation by the amended plan, we do not think the law requires or contemplates the useless expense and delay of a hearing at which no action could be taken by the supervisors. The amended plan herein serves exactly the same lands as the original, and the fact that it might not be as favorable to the District as the first one would not authorize any action by the supervisors. There is no merit in this objection.

The last question raised is that some 15 parcels of land set forth in the list required to be filed with the supervisors are not described with sufficient precision. The purpose of this list, together with the map which accompanies it, is that it may be known exactly what lands receive the benefits, and are subject to the burdens, of the District, and to what degree, and, if the land is described with enough particularity so that this may be done, it is sufficient. ''That is certain which can be made certain.'' It is admitted that, by taking the list and the map together, the description is positive and definite. They are both records of equal weight and the list refers to the map. We do not think the bonds are invalid for this reason.

This disposes of all the objections suggested by counsel, and, finding nothing therein affecting the validity of the bonds in question, the judgment of the lower court is affirmed.

McALISTER, C. J., and ROSS, J., concur.