[Civil Nos. 3872, 3886, 3887.   Filed July 6, 1937.]

[70 Pac. (2d) 452.]

B. F. REICHENBERGER, Appellant, v. SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, Appellee (3872); B. F. REICHENBERGER, Appellant, v. SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, Appellee (3886); SALT RIVER VALLEY WATER USERS ASSOCIATION, a Corporation, Appellant and Cross-Appellee, v. SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, Appellee and Cross-Appellant (3887), (Consolidated).

Mr. Charles A. Lambie, for Appellant in Nos. 3872 and 3886, and for Appellee and Cross-Appellant in No. 3887.

Messrs. Sloan, Scott & Green, for Appellee in Nos. 3872 and 3886, and for Appellant and Cross-Appellee in No. 3887.

LOCKWOOD, J.—These three actions were brought before us on appeal from the superior court of Maricopa county, under the circumstances set forth hereinafter. While they are separate in form, and, legally speaking, the judgments rendered therein are different, yet we think the issues raised can be best considered and determined in one opinion, and we shall, therefore, so treat them, entering the proper formal judgment in each separate case.

In order that we may consider and discuss properly the legal issues involved, it is advisable that we should state briefly the circumstances out of which these actions arose. In the last decade of the nineteenth century it was apparent that agriculture in the Salt River Valley had reached its limit, unless some method could be adopted for storing the flood waters of the Salt and Verde Rivers for use in the time of shortage of the natural flow of these rivers. This involved the expenditure of a large amount of money, and for many reasons it was impossible to secure private capital for this purpose. An appeal was, therefore, made to the federal government for aid. After some years of negotiations a plan was worked out under which the government was willing to advance funds to construct a storage reservoir on the upper regions of Salt River. One of the necessary steps in this plan was the formation of one organization to represent the farmers of the Salt River Valley in their dealings with the government, and the Salt River Valley Water Users Association, hereinafter called the "association," was incorporated for this purpose. While its articles of incorporation are voluminous, and in many respects unique, yet in substance the association is a private corporation, organized under the laws then applicable to private corporations, and functioning as such. The association entered into contracts with the

federal government, which provided substantially as follows: The government advanced the funds necessary for the building of the Roosevelt reservoir and later the extension of the distributing irrigation system of the valley, and retained and still retains the legal title thereto, although the actual operation of the system has long since been turned over to the association. The association obligated itself to repay to the government, within a stipulated period of time, the amount of money expended by the latter for the irrigation system, together with interest thereon. The period for repayment was extended by Congress from time to time, and though much of the original indebtedness has been paid, a considerable portion is still outstanding.

It soon appeared that the complete developments of the waters of the Salt and Verde, together with the electric power which might be generated thereby, required additional works of an extensive character. The government declined to advance any further money for this purpose, but did permit the association to issue bonds and to cause these works to be constructed on its own account, the legal title thereto being held by the government, and an additional indebtedness of many million dollars was incurred by the association in this manner. It later appeared that it was advisable to establish a storage reservoir on the Verde River, and after considerable difficulty an arrangement was made with the government to furnish the funds for this and some other improvements of the irrigation system of the association, on the same general terms as it did for the Roosevelt reservoir, to wit: The title to the works to remain in the government, but the plant to be operated under a guaranty of repayment by the association. As a result of all these proceedings, the association was operating, with the ultimate prospect of owning, a very complete and

extensive irrigation and power system, but was indebted many million dollars therefor, both to the United States government and to private bondholders; the interest alone on its obligations amounting to hundreds of thousands of dollars annually. All of these debts ultimately had to be met by payments made by the owners of land irrigated by the association. Its officers naturally, and very properly, endeavored to reduce these costs so far as possible, and finally evolved a scheme which, if successful, would result in the saving of several hundred thousand dollars of interest annually. This plan may be stated generally as follows:

In the year 1922 the legislature of Arizona had provided for the organization of what were denominated agricultural improvement districts (Laws 1922, Sp. Sess., chap. 23). The general substance of the act authorizing these districts may be stated as follows: Whenever a prescribed number of landowners desired to do so, they could file a petition with the board of supervisors of the proper county, asking that a district be formed for the purpose of irrigating the land within specified boundaries. Upon compliance with the terms of the act, the district was formed and could finance itself in the manner set forth in the act, and levy taxes on the lands in the district to meet its necessary expenses. At least two districts were formed under this act, and shortly after their organization it appeared to be for the mutual benefit of these districts and the association that the latter should guarantee certain bonds of the districts, issued for the purpose of providing irrigation systems therefor. The question of whether or not such a thing could be done came before this court in the case of *Bethune* v. *Salt River Valley, etc.*, 26 Ariz. 525, 227 Pac. 989. In this suit there were two objections raised: (a) That the law authorizing the organization of the districts was

unconstitutional; and (b) that the association was not authorized to guarantee their indebtedness. The constitutional objection was based on three points: The first, that the right to vote on district questions, including the election of officers, was limited to owners of real estate; the second, that the district, although a private organization, was given the authority to levy a tax; the third being a technical one which is immaterial in the present case. We held that neither of the objections to the constitutionality of the act were valid ones, and that the legislature had the power to provide for the organization of districts in the manner and with the powers set forth in the act. We also held that the interest of the association in the proper functioning of the districts so organized was such that it might, under conditions which we held existed in that case, guarantee the bonds issued by the districts.

Districts of a nature like that of our agricultural improvement districts have been authorized in a number of the western states, and many questions have arisen as to the character, powers, and rights of these districts. One of the most frequent questions has been the extent to which they are subject to various constitutional limitations, and in determining such questions it has frequently been necessary to decide whether the district was a private corporation, a municipal corporation, or an organization of some other character, for upon the answer to this question would depend what constitutional limitations applied to them.

The officers of the association evidently came to the conclusion that there was perhaps some authority for a conclusion that these districts were municipal corporations in the fullest sense of the word, subject to the limitations imposed by law upon such corporations, and with correlative rights. Among the important rights granted to municipal corporations, under the

Constitution of Arizona, is that of exemption from any form of taxation, both as to their property and securities issued by them. It, therefore, occurred to the officers of the association that if a district could be organized under the agricultural improvement district act which would issue its bonds for the purpose of providing money to take up the outstanding bonds of the association, the bonds of the district, for reasons which are too well known for discussion, could be placed at a much lower rate of interest than those issued by the association as a private corporation, and the stockholders of the association, who, of course, would ultimately pay the district bonds, would thus be saved a very large sum of money each year. A request was, therefore, made that the legislature amend the agricultural improvement district act by including among the purposes for which such districts might be organized, the following:

" . . . or to reduce the cost of irrigation, drainage and power to the owners of the lands in said district by the sale of surplus water or power produced, owned or controlled by the district, and the construction, maintenance, extension, replacement, financing, and refinancing of the works useful for said purpose; or to finance or refinance as its own obligation all or any part of the debt heretofore incurred or hereafter proposed to be incurred by any public or private agency in the construction, maintenance, improvement or replacement of the structures and equipment necessary or useful for the accomplishment of any of the above purposes;"

And that other amendments as were necessary to make the act conform to the foregoing provision be added. It also requested that the legislature include the following provision in the act:

"3510. *Municipal status of district.* Agricultural improvement districts organized under the provisions of this article are hereby declared to be public, politi-

cal, taxing subdivisions of the state of Arizona, and municipal corporations to the extent of the powers and privileges herein conferred or granted generally to municipal corporations by the constitution and statutes of the state of Arizona now in force, or hereafter to be adopted or passed, including immunity of their properties and their bonds from taxation.''

The legislature, in 1936 (Laws 1st Sp. Sess., 1936, chap. 10) complied with the request of the association and made the desired amendments. Thereafter, and for the sole purpose of carrying out the plan aforesaid, the officers of the association caused a district to be organized under the act, which was in substance, though not in law, the *alter ego* of the association; provided for the issuance by the district of $13,000,000 of its bonds, and then caused a contract to be entered into between the district and the association, the substance of which was that the district was to issue bonds and turn the proceeds over to the association, and levy the necessary taxes to pay the bonds as they became due, while the association was to use the proceeds of the bonds to pay off $13,000,000 of its outstanding indebtedness, and then collect from its members a sufficient amount of money to reimburse the district for the amount of taxes it was compelled to levy to meet the new bonds. There were many other details in the contract, but these were the essential provisions. The ultimate result of these transactions, if it were held that the district was a municipal corporation, *with its securities and property exempt from taxation,* was that the association and its members would be saved several hundred thousand dollars per annum. There was, however, considerable doubt as to whether, notwithstanding all the elaborate machinery provided by the association and the legislature for the carrying out of this plan, the bonds issued by the district would be free from taxation or not, and it was felt necessary,

before the bonds were sold and the whole transaction brought to a successful conclusion, that this court should declare in advance that they would be tax free, for unless we did so, they could not be sold at a sufficiently low rate of interest to benefit the association particularly.

Three suits were, therefore, brought for the purpose, if possible, of obtaining the desired declaration from this court. The first was in form one by a resident and property owner within the new district, questioning the validity of the organization of the district; the second was another one by the same property owner questioning the validity of the bonds whose issuance had been authorized by the voters of the new district after its organization; and the third was one between the district and the association under the declaratory judgment act, asking that this court determine the obligations of the respective parties under their contract. Though different in form, the real purpose, as we have said, was to obtain a judgment of this court that the bonds of the district would be tax free.

All three of the cases were determined by the superior court in the manner desired by all of the parties thereto, upholding in all respects the legality of the organization of the district, the validity of the bonds, and the contention that they were exempt from taxation. They were then brought before us by the usual method of appeal, to secure the judgment of this court on the tax exemption question.

It is evident from the entire record that this is, in effect, as we have said in *Re Verde River Irrigation & Power District*, 37 Ariz. 580, 296 Pac. 804, *Day* v. *Buckeye Water Conservation & Drainage Dist.*, 28 Ariz. 466, 237 Pac. 636, and *Allison* v. *City of Phoenix*, 44 Ariz. 66, 33 Pac. (2d) 927, 93 A. L. R. 354,

a friendly suit in which all of the parties thereto are extremely desirous of having this court declare that the bonds of the district above referred to will be valid obligations of the district, and free from taxation, if, as, and when issued. In *Maricopa County Municipal Water Conservation District No. 1* v. *LaPrade,* 45 Ariz. 61, 40 Pac. (2d) 94, we stated that in cases of this nature the judgment of the court will be limited to the precise matters which, under the law, we must decide under the legal issues necessarily and properly raised, and to none other, reserving as open any questions presented by the record which have not been expressly decided by us in our judgment. With this declaration of the limitations of the judgments which we shall render, we proceed to a discussion of the issues properly and necessarily before us. We take up the three suits in their numerical order.

■■ The first is the one as to the validity of the organization of the district itself. We have already held in the Bethune case, *supra,* that the statute providing for the organization of agricultural improvement districts was a valid and constitutional one as it appears in the Revised Code of 1928. We are further of the opinion that the amendment allowing such districts to be organized not only for the purpose of establishing a new irrigation system or the improvement of one already in existence, but for the purpose of providing funds to pay for irrigating systems already serving the lands of the district, or for indebtedness incurred in the construction of such system by another organization, is within the power of the legislature to make. So far, however, as the constitutionality and effect of section 3510, *supra,* is concerned, we expressly reserve our opinion. That section is merely a declaration by the legislature of what it thinks the status of such district is. It is separable from

the balance of the act, and whether it be constitutional or unconstitutional, it can in no manner affect the manner or legality of the organization of a district under the terms of the act. Its constitutionality is, therefore, neither a necessary nor a proper issue in the first suit, which involves merely the legality of the organization of the district. The record shows the method of organization set up in the act was carefully followed, and for this reason the judgment of the superior court in action No. 3872, which upholds the validity of the organization, but expressly states that its status will not be considered nor determined, should be affirmed as rendered.

The next suit is brought under sections 3511 and 3512, Revised Code of 1928, for the purpose of determining the validity of the bonds issued by the district. Since there is no question that all of the various structures, for the erection of which the indebtedness of the association was incurred, are actually engaged in and necessary to the proper irrigation of the lands of the district, by the express terms of the amended act the bonds of the district may be issued for the purpose of refinancing the association by paying off its bonds, provided always, of course, that these bonds are issued and disposed of in the manner provided by law. We are satisfied from the record that the issuance of such bonds was approved by the voters of the district in the manner required by law. We have held in the Bethune case, *supra,* that where both the association and a district organized under the act are interested in the guaranteeing of the bonds of such district, this may be done. Since, in the present case, the district is the *alter ego* of the association, we think that the refinancing of the debt of the association is sufficient consideration for both the district and the association to authorize the enter-

ing in of the contract between the two. As was said by the trial court, "the ultimate parties in interest of both the association and the district are the landowners within the identical boundaries of the association and the district," and we must presume that a refinancing of the existing indebtedness is beneficial to the parties who must ultimately pay the debt—in this case such landowners.

But when it comes to that portion of the decree of the trial court which holds that the bonds, when issued, will be tax exempt, we are of the opinion that such a question was neither a necessary nor a proper issue in a bond validation suit under sections 3511 and 3512, *supra*. There are several reasons for this conclusion. The first is that the *validity* of the bonds—the only question permitted to be considered in a suit under these sections—is in no way dependent upon the question of whether they are tax free or not. But the principal reason why we should not determine in this suit whether they are tax free is that the party most vitally interested in the question is not, and cannot be, represented in the suit. The state of Arizona has a greater interest in determining whether certain property is subject to taxation or not than any individual citizen, and we are of the opinion that in no suit can such an issue be determined unless the state, through its proper officers, is legally a party thereto. And we cannot see where, under the proper issues of a bond validation case, the state may ever be made a party for this purpose. It has not raised the issue of taxation, nor, so far as we are advised, is it attempting to tax the bonds in question or the income therefrom. If, as, and when it makes such an effort, a bondholder may certainly, in a proper proceeding, raise the issue of tax exemption, but until an attempt is made to levy and collect a tax, we have never heard

of a court determining in advance whether the tax would be valid if the attempt *should be* made. We think, therefore, that the judgment of the superior court of Maricopa county, in action 3886, should be affirmed in so far as it holds the bonds to be issued by the district are valid obligations of such district, if, as, and when issued, but that the portion of the judgment which attempts to pass on the question of whether the bonds are tax exempt, or the nature of the district, should be reversed as not within the issues of the case.

■■ Action No. 3887 is one brought under chapter 93, article 12, Revised Code of 1928 (section 4385 et seq.), commonly called the declaratory judgment act. The complaint states that the action was brought "for the purpose of obtaining a judicial determination of the powers of the parties hereto to make, their rights under, and the construction of a certain written agreement made and entered into by and between the parties to this action on March 22, 1937." The particular contract which it is sought to have us construe is the one between the association and the district above referred to, which states the terms under which the district will issue the bonds in question and the manner in which the proceeds thereof shall be used for paying off the bonds of the association. A large portion of the contract is devoted to a recital of the reasons why the district and the association made the contract. The reasons which induce parties to enter into a contract are generally immaterial as a matter of law. If there be a legal consideration for the contract, then the question for the court is not *"why* did the parties make the contract," but "what contract did they make." We think it unnecessary to set forth the contract in full, as the various conditions and covenants thereof, leav-

ing out the inducements, cover some twenty type-written pages. We have already held that the contract is a valid one, and the parties do not claim there is any doubt as to what they are required to do by its terms. Apparently their only doubt is as to the constitutionality of section 3510, *supra,* and they do ask us to decide that question. We cannot see where such a question is involved, or can be involved, in determining the duties of the parties under the contract. We have examined it carefully, and nowhere therein do we find any promise or agreement by either the district or the association which is dependent in any manner upon whether section 3510, *supra,* is constitutional or not. For this reason, we think that the declaratory judgment act does not permit the raising of the constitutional issue in action No. 3887. We, therefore, hold that the judgment of the superior court in case No. 3887 should be modified by striking therefrom any reference to section 3510, *supra,* or the question of whether the bonds of the district will be exempt from taxation, and, as so modified, it should be affirmed.

The proper formal judgment in each separate case will be rendered in conformity with this opinion.

McALISTER, C. J., and ROSS, J., concur.