463 P.2d 840

Cecil MILLER and Orville Knox, shareholders of the Salt River Valley Water Users' Association, and all other shareholders similarly situated, Appellants,

v.

SALT RIVER VALLEY WATER USERS' ASSOCIATION; and Salt River Project Agricultural Improvement and Power District, Appellees.

I CA–CIV 856.

Court of Appeals of Arizona, Division 1.

Department B.

Jan. 15, 1970.

Rehearing Denied Feb. 10, 1970.

Review Denied March 10, 1970.

Richard Kamps, Phoenix, for appellants.

Jennings, Strouss & Salmon, by J. A. Riggins, Jr., Rex E. Lee, A. J. Pfister, Phoenix, for appellees.

JACOBSON, Judge.

A slice of Arizona history, as it deals with the development of water and electrical power in the Salt River Valley, is revealed in this appeal from the granting of a declaratory judgment by the Superior Court of Maricopa County.

Plaintiffs-appellees, Salt River Valley Water Users' Association, hereinafter referred to as "association", and Salt River Agricultural Improvement and Power District hereinafter referred to as "district", brought a suit for declaratory judgment against defendants-appellants Cecil Miller and Orville Knox as shareholders of the association and as representatives of all other shareholders of the association similarly situated. The declaratory judgment action sought a determination of the validity of a proposed program of the association and district to pay moneys to certain shareholders of the association who are presently being served electrical power by Arizona Public Service.

A brief historical background is first necessary to understand the facts in this case and the relationship between the association and the district. A more comprehensive recitation of this history is found in Uhlmann v. Wren, 97 Ariz. 366, 401 P. 2d 113 (1965); Reichenberger v. Salt River Project Agricultural Improvement and Power District, 50 Ariz. 144, 70 P.2d 452 (1937); and Orme v. Salt River Valley Water Users' Association, 25 Ariz. 324, 217 P. 935 (1923).

The association was formed under the general corporation laws of the territory of Arizona in 1903, for the purpose of furnishing water for irrigation, power for domestic and ordinary purposes, and drainage under the auspices of the United States Reclamation Act of 1902 (now 43 U.S.C.A. sec. 371 et seq. (1964)). Subsequent to the formation of the association, various agreements were entered into between the association and the United States government which culminated in 1917 in the association taking over the operation and management of the irrigation and electric system from the Bureau of Reclamation and the assumption by the association of the obligation to repay the cost of the system to the United States government.

The district was formed in 1937 under the Agricultural Improvement District Act. (Ariz.Rev.Code of 1928, sec. 3467 et seq., as amended, ch. 10, Laws of 1936, 1st Spec.Sess. 29 (codified in Code of 1939 sec. 75–701 et seq.).) The association on March 22, 1937 entered into an agreement with the district whereby the ownership of the properties of the association were transferred to the district. On September 12, 1949, the 1937 agreement was amended to provide that the operation and management of the electric power system would be vested in the district, while the association would operate and maintain the irrigation and drainage system as agent for the district. A portion of the 1949 amendment contained a provision that the district would assume all obligations of the association. This particular provision is in controversy in this action.

With this brief background in mind, we now turn to historical development of the dispute in issue here. In 1928, the Salt River Valley was primarily an agricultural community and without extensive electrical service, although a private utility company, Central Arizona Light and Power Company, was operating in the area.

In order to supply electrical power to the Valley, a proposal was made to build Stewart Mountain Dam, the cost of this construction to be supplied by the sale of bonds of the association. Part of the electricity to be generated by the construction of this dam was to be retailed by the association and part was to be wholesaled to Central Arizona Light and Power Company.

The bond issue was rejected by the shareholders of the association when first submitted because of the lack of some agreement as to the service areas between the association and the private utility. As a result of this rejection by the voters of the association, a territorial agreement was entered into between the association and Central Arizona Light and Power Company under which the areas served by the private utility would not exceed over 15 percent of the member lands of the association. This service area shall be referred to hereafter as "the 15 percent area".

This particular agreement raised a collateral problem, that is, if all member lands were subject to assessment for payment of the bonds, should not the association members being within the 15 percent area be guaranteed that they would not have to pay more for electricity than other members living outside the 15 percent area? In order to facilitate the passage of the bond issue and to allay the fears of members living within the 15 percent area not served by the association, the shareholders of the association in 1928 amended the Articles of Incorporation of the association to provide as follows:

> "The objects for which the Association is organized and the general nature of the business to be transacted by it shall be and are:
>
> \*     \*     \*     \*     \*     \*
>
> To provide for and distribute and furnish to the lands of the holders of shares of said Association to which said shares and the rights and interests represented thereby are appurtenant, an adequate supply of power for domestic and ordinary farm purposes. Such power may be furnished and delivered directly by the Association to all or any part of said lands and by contract with any public service corporation not to exceed fifteen percentum of said lands. *Provided, that if any shareholder shall be required to pay substantially more for power used by him for domestic and ordinary farm purposes furnished by a public service corporation under contract with the Association, taking into consideration kind and quality of service than shareholders furnished such power directly by the Association, such shareholder shall be entitled to compensation for such excess paid by him.* Such compensation shall be made in pursuance of rules and regulations prescribed by the by-laws of the Association \* \* \*." (emphasis supplied)

It is noted that the amendment only provides that shareholders who use power for "domestic and ordinary farm purposes" would be entitled to compensation. As explained at time of trial of this action, the reason for this limitation was that in 1928 "practically all of the landowners were farmers."

In the 34 years following the adoption of the 1928 amendment to the Articles of Incorporation of the association, the 15 percent area has changed from a farming community to an urban community consisting primarily of industrial, commercial and domestic users, these domestic users being primarily on lots of less than one acre.

Until 1962, the cost of electricity to domestic and farm users served by the district was not substantially less than for those served by Arizona Public Service, the successor in interest to Central Arizona Light and Power Company. However, in 1962, the Board of Directors of the district determined that a substantial difference existed between the domestic and farm rates charged by the district and the corresponding rates charged by Arizona Public Service. The Board of Directors

further determined that a "substantial" difference meant a difference of 15 percent or more. The determination that 15 percent or more is "substantial" is not challenged by the defendants.

Following these determinations, the Board of Directors of the district by appropriate resolution and the Board of Governors of the association by appropriate amendments to its by-laws, prescribed a means for reimbursing the shareholders living within the 15 percent area.

Under the reimbursement plan, industrial or commercial users, shareholders who fall into the agricultural pumping class, and lessees and tenants, would be excluded from receiving the rebate. Also the reimbursement would be paid by the district and not the association.

Because certain shareholders of the association threatened litigation in the event the reimbursement was paid, the association and the district brought this declaratory judgment-class action. The trial court made findings of fact and conclusions of law and entered judgment in favor of the association and district sanctioning the proposed reimbursement plan.

Defendants raised no issue on appeal as to the propriety of the declaratory judgment action or that they are not representative defendants in the class action. Defendants do raise three issues which may be summarized as follows:

1. Is that portion of the 1928 amendment to the association's Articles of Incorporation dealing with reimbursement so discriminatory as to be invalid and unenforceable?

2. By the 1949 amended agreement between the association and the district, did the district assume the obligation of the association to its shareholders, and if so, does the district have statutory authority to make such an assumption?

3. If the reimbursement plan is valid, are "shareholders" *only those persons owning one acre or more of irrigable land?*

In support of defendant's first contention, it is argued that since the association is a quasi-public corporation, Citrus Growers' Development Association, Inc. v. Salt River Valley Water Users' Association, 34 Ariz. 105, 268 P. 773 (1928), and the district is a municipal corporation, Uhlmann v. Wren, supra, they may not discriminate among users of electrical power under general public utility law. Arizona Constitution art. 15, sec. 12, A.R.S.; A.R.S. 40–334 (1956). The argument continues that because commercial and industrial users, irrigation pumping users, and lessees and tenants are excluded under the reimbursement plan, discrimination among users occurs which makes both the reimbursement plan and the 1928 amendment to the Articles of Incorporation authorizing the same invalid.

■ Defendants in this regard confuse the obligation of a public service corporation to provide non-discriminatory service and rates to its customers with the obligation of the association to its non-customer shareholders residing in the 15 percent area. The non-discrimination doctrine referred to by the defendants has been defined as an obligation of a public service corporation to provide impartial service and rates to all its customers similarly situated. Town of Wickenburg v. Sabin, 68 Ariz. 75, 200 P.2d 342 (1948). The key word here, of course, is *customers.* Those shareholders residing in the 15 percent area, under the territorial agreement of 1928 with Central Arizona Light and Power, were not customers of electrical power of the association in 1928 or of the district presently. Therefore, the doctrine of discrimination does not come into play for the reimbursement plan would not go to *customers* of the district.

■ On the other hand, the association does have an obligation to its shareholders residing in the 15 percent area arising out of its Articles of Incorporation as amended in 1928. In Arizona, articles of a corporation give rise to a contractual relationship among the shareholders themselves, and between the corporation and its sharehold-

ers. Schram v. Smith, 97 F.2d 662 (9th Cir. 1938). We do not believe that it can be seriously argued that a corporation, even a public service corporation, cannot fulfill its contractual obligations, if, in fact, the contractual obligation is a valid one. Here, there is no contention that the 1928 amendment to the Articles of Incorporation is invalid ab initio, as creating a special class of shareholders. Classes of shareholders were specifically authorized in Arizona by a 1922 amendment to sec. 2100 of the 1913 Civil Code (ch. 29, sec. 1, Laws of 1922, Spec.Sess. 121), which provided:

"* * * (T)hat every corporation may provide for the issuance of one or more classes of stock without any nominal or par value of such number of shares, with such designations, and preferences, if any, as shall be stated and expressed in the articles of incorporation or in any amendment thereof; * * *."

We therefore hold that the 1928 amendment to the Articles of Incorporation of the association, being a valid exercise of its corporate powers, created a corporate obligation to those shareholders residing in the 15 percent area, and the proposed reimbursement plan of the district and association is in furtherance of this contractual obligation and therefore nondiscriminatory.

The defendant's second contention is that even though the obligation created by the 1928 amendment may be valid in principle, it is an obligation between the association and its shareholders which the district cannot assume to pay as is intended under the present reimbursement plan. The district contends that by the 1949 amendment to its 1937 agreement with the association it assumed this obligation. The pertinent portion of the 1949 amendment is as follows:

"The District does hereby assume, take over, and agree to conform to the several duties, obligations, and covenants of the Association under all contracts to which the Association is a party, and the Association is hereby relieved of its duties, obligations and covenants under all contracts to which it is a party, provided that the Association, in the operation and maintenance of the irrigation and drainage system as agent for the District, shall continue to conform with those provisions of said contracts which have to do with the storage, diversion, or delivery of water to or for the benefit of others."

To determine whether the language used here is broad enough to include a contractual obligation of the association to its shareholders, depends upon the intention of the parties. Cf. Bassett v. City Bank & Trust Co., 116 Conn. 617, 165 A. 557 (1933). Again, to determine this intention it is necessary to review briefly the particular characteristics of both the association and the district and the rights of the shareholders thereunder. From the Articles of Incorporation of the association it is apparent that the shareholders of the association do not have the rights usually associated with those of a stockholder in a private corporation. The shareholders' status here is basically the right to receive water from the association with a corresponding obligation to pay assessments of the association, these assessments being liens on the lands of the shareholders. Citrus Growers' Development Association, Inc. v. Salt River Valley Water Users' Association, supra. The relationship between the district and the association is also unique. The sole purpose in forming the District initially was to allow the association to finance its various projects at an advantageous interest rate. Reichenberger v. Salt River Project Agricultural Improvement and Power District, supra. Moreover, as was pointed out in *Reichenberger*:

"Thereafter, and for the sole purpose of carrying out the plan aforesaid, the officers of the association caused a district to be organized under the act, which was in substance, though not in law, the *alter ego* of the association;

* * *." (Emphasis in original.) 50 Ariz., at 151, 70 P.2d, at 455.

With the transfer by the association to the district of all its rights the district in its role as the "alter ego" of the association, undertook to fulfill the association's obligation to furnish water to the shareholders, although the association itself continued to perform this service, as agent for the district. As previously pointed out, the only right a shareholder has in the association pursuant to the original Articles of Incorporation is the right to receive water, which obligation of the association has been assumed by the district.

■ By the district becoming in fact the alter ego of the association, and by assuming the basic obligation of the association to its shareholders, that is, the supplying of water, there are sufficient facts from which, in our opinion, it can be inferred that it was the intention of the district and the association that the district also assume the *obligation of the association to its* shareholders residing in the 15 percent area relating to reimbursement for differing power charges.

The defendants next contend that even if the 1949 amendment was broad enough to embrace this obligation, the district has no statutory authority to do so.

Suffice it to say that A.R.S. sec. 45–935(4) (Supp.1969–70) gives the Board of Directors of the district the power to "make, execute, acknowledge and perform any and all contracts, agreements and obligations it deems advisable for the interest of the district or to carry out or accomplish any of the purposes authorized or permitted by this chapter."

■ One of the "purposes authorized" is the sale and distribution of electricity. Uhlmann v. Wren, supra. In order to carry out this purpose, the district entered into the agreement of 1937 as amended in 1949 which contained the assumption language. We are not prepared to say that the agreement of 1937 as amended in 1949 was not, in its totality, "for the best inter-

ests of the Districts". Therefore statutory authority exists under A.R.S. sec. 45–935(4) (Supp. 1969–70), quoted above, for the assumption of the obligation of the association in question here.

■ Defendant's last contention is that, in any event, if this reimbursed plan is carried out, only shareholders owning one acre or more of irrigable land are entitled to reimbursement. This contention is based on the provision of the Articles of Incorporation of the Association which provide:

"For each acre of such lands shareholders may become the owners of one share of stock of this Association and no more."

The trial court found as a fact:

"19. That, although shareholders of plaintiff ASSOCIATION owning less than one acre of member lands are not entitled to vote under the Articles of Incorporation of plaintiff ASSOCIATION, such shareholders, nevertheless, remain subject to the obligations and entitled to the benefits provided for under the Articles of Incorporation and Bylaws of plaintiff ASSOCIATION, and plaintiff ASSOCIATION and plaintiff DISTRICT remain obligated to deliver the water appurtenant to such lands, and said obligation continues notwithstanding the fact that such lands are no longer used for agricultural purposes."

We have stated on numerous occasions that findings of fact by the trial court will not be disturbed on appeal if there is any reasonable evidence to support the same. Sheeley v. Sheeley, 10 Ariz.App. 318, 458 P.2d 522 (1969). A review of the testimony and exhibits offered at time of trial reveals there is substantial evidence to support this finding of fact by the trial court. We therefore hold that the term "shareholders", as that term is used by the Articles of Incorporation of the association and as applicable here means all persons owning and occupying member land within the 15 percent area, notwithstanding the fact that such land is not now being irri-

gated or susceptible of irrigation and notwithstanding the fact that such owner owns less than one acre of member land.

The judgment of the trial court is affirmed.

EUBANK, P. J., and HAIRE, J., concur.