401 P.2d 113

Ernest A. UHLMANN and Billie Uhlmann, husband and wife, et al., Petitioners,

v.

Honorable Laurance T. WREN, as Judge of the Superior Court of the State of Arizona in and for the County of Maricopa, and the Superior Court of the State of Arizona in and for the County of Maricopa, Respondents,

and

Salt River Project Agricultural Improvement and Power District, Real Party in Interest.

No. 8243.

Supreme Court of Arizona.

En Banc.

April 15, 1965.

**370**

Snell & Wilmer, Phoenix, for petitioners Uhlmann, Rew and Leiber.

Leibsohn, Garrett & Goldstein, Dushoff & Sacks, Phoenix, for petitioners Kortz and Laff, dba Equitable Investments and Antonoff.

John E. Madden and John S. Schaper, Phoenix, for petitioner Ginn.

Kramer, Roche, Burch & Streich, Phoenix, for petitioners Ciruli, Park Central Investment Corp., and Park Central Farms.

Leo N. Smith, Tucson, for petitioners Verity, Teague and Patterson.

Evans, Kitchel & Jenckes, Phoenix, for petitioners Pilcher, Bradstreet, and Speer.

Jennings, Strouss, Salmon & Trask, Phoenix, for respondents and real party in interest.

Gentry, McNulty & Toci, Bisbee, for Arizona Electric Power Cooperative, Inc., amicus curiae.

Merle L. Hanson, City Atty., Melvin J. Mirkin, Asst. City Atty., Phoenix, for the City of Phoenix, amicus curiae.

LOCKWOOD, Chief Justice:

This case is here by Writ of Certiorari issued to the respondent, Superior Court of Maricopa County, Judge Laurance T. Wren, presiding. Petitioners are landowners whose property was the subject of eminent domain proceedings instituted by the Salt River Project Agricultural Improvement District, the real party in interest. After due notice and hearing, Judge Wren ordered that the District be let into immediate possession of the land. Such an order is authorized under A.R.S. § 12–1116, and under Art. 2, § 17 of our constitution,

A.R.S., when the condemning agency is a municipal corporation.

The facts giving rise to this controversy are as follows: The District has entered into an agreement to purchase electrical energy from Colorado Ute Association, Inc., a Colorado association. This energy will be produced at steam-generating plants in Colorado and New Mexico and will be delivered to the Federal Government in those states. In exchange, the District will take delivery of 144,000 kilowatts of electricity generated by the United States at the Glen Canyon Dam in northern Arizona. This exchange electricity will be sold to the District's customers in the Phoenix area. Petitioner's land is the site of a proposed tranmission line to accommodate the exchange power.

Petitioners challenge the validity of the transaction pursuant to which the District seeks to condemn their land. They contend that there is no statutory justification for the proposed undertaking.

■ This transaction for the development, purchase, and sale of power must find statutory justification in the provisions of § 45–903 of Chapter 4, which sets out the purposes of agricultural improvement districts and operates as a restriction on their lawful functions. Most of the powers relate to the District's principal functions of irrigation and drainage, only two paragraphs making specific reference to the de-

velopment and distribution of power. These pertinent provisions of A.R.S. § 45–903 provide as follows:

§ 45–903. Purposes for which district may be organized.

"A. When five or more holders of title or evidence of title to agricultural lands which have at any time been recognized as within the exterior boundaries of a United States reclamation project and which are susceptible of irrigation by the same general system of irrigation works, desire to provide for the improvement of such lands, they may propose the organization of an agricultural improvement district under the provisions of this chapter for any of the following purposes:

\* \* \* \* \* \*

"6. To provide new or additional means for the irrigation or drainage of all or a part of the lands or to provide power or a means of communication for the use of the owners or occupants of the lands.

"7. To reduce the cost of irrigation, drainage and power to the owners of the lands in the district by the sale of surplus water or power produced, owned or controlled by the district, and the construction, maintenance, extension, replacement, financing and refi-

nancing of the works useful for such purpose. * * *"

If the transaction in question—and hence the condemnation—can be upheld under subsection A, paragraph 6 of section 45–903, the District must carry the burden of showing that the exchange power will be sold to consumers within the district. This is true because A.R.S. § 12–1112 provides as follows:

"Before property may be taken, it shall appear that:

"1. The use to which the property is to be applied is a use authorized by law. * * *"

However, nothing in the record indicates how much, if any, of the power will be used by those within the geographical boundaries of the District. On cross-examination, Mr. Glenn W. Brandow, the Associate General Manager of the District, testified that the load requirements of the District on which the proposed transaction was based were not broken down to reflect the power needs of those within the District as opposed to those outside the District. Thus, the transaction cannot be upheld under subsection A, paragraph 6. If such authority exists, it must be justified as an outside sale of surplus power, authorized by subsection A, paragraph 7 of § 45–903.

The issue of statutory construction presented for decision may be stated as follows: Does the transaction in question qualify as a "sale of *surplus* * * * power *produced, owned or controlled* by the district", "to reduce the cost of irrigation, drainage and power to the owners of the lands in the district"?

Petitioners contend that the term "surplus" refers to a "natural" or "incidental" surplus; that the Legislature contemplated excesses of power and power development opportunities arising in the course of a district's water-storage and irrigation activity; that to permit the sale of this excess would greatly enhance the efficiency of the entire system and reduce the cost of irrigation and drainage operations. Paragraph 7, it is urged, was thus adopted to avoid unnecessary waste for want of authority in the District.

On the other hand, respondents argue that the Legislature intended only to assure that electrical energy would not be sold in other areas so long as landowners within the District were inadequately supplied; that "surplus" means any power beyond that needed in the district itself, regardless of whether it was produced as a result of the irrigation and drainage functions of the District.

Thus, it appears that the crucial difference between the two parties lies in their respective answers to the question of whether the District must show a relationship between its power operations and its irrigation functions in addition to the

subsidy relationship existing between the use of the revenues from its power operations to reduce the cost of irrigation water to the District. The proper resolution of this question entails an historical analysis of the legislation authorizing the existence of the District and delineating its functions.

### Historical Analysis

The early history of the Salt River Valley wherein the District is located, is traced in a publication of the Reclamation Commission entitled Reclamation Project Data, (Government Printing Office, 1961). We quote pertinent parts which read as follows:

"A large part of the Salt River Valley was irrigated and cultivated in prehistoric times, but abandoned before white men entered the valley. Irrigation of the valley by white settlers began about 1867. The river-flow was erratic, varying from a small stream to enormous floods. Shortly after settlement began, and especially during years of drought, the supply of water at low river stages was inadequate for the land in cultivation. River flows in excess of immediate needs or canal capacities were lost, due to lack of storage facilities. Maintenance of the brush and rock diversion dams also became a problem, for they were often washed out at the beginning of a flood and could not be replaced until

the water was again low in the river. Years of good water supply were followed by years of drought, causing the loss of valuable vineyards and orchards. In 1895 a few of the farmers formed what they called the 'Farmers' Protective Association,' the prime purpose of the association being to secure legislation concerning water rights. * * *" Reclamation Project Data, p. 664.

The first legislative step for federal financial participation with private reclamation organizations was taken by Congress in passing the Act of June 17, 1902, 32 Stat. 388, known as the Reclamation Act, now codified as 43 U.S.C.A. § 371 et seq. The act set up a reclamation fund derived from the sale of public lands in Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, and Wyoming. This fund was:

"to be used in the examination and survey for and the construction and maintenance of irrigation works for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands in the said States and Territories * * *." 32 Stat. 388.

It is manifest from this statute, which was the inception of active federal reclamation

legislation, that Congress adopted it as a deliberate policy for development of the West. Such development was unquestionably in furtherance of the national economic expansion. Reclamation of potentially productive areas located in vast portions of arid and semiarid lands by means of irrigation, would benefit not merely the individual land owners, but also the local district, and eventually the territories and states embraced within the reclamation statutes.[1] Hence broad powers were granted to the Secretary of the Interior for accomplishment of such development. The state and congressional implementing legislation conferred necessary authority upon agricultural districts set up to carry out specific reclamation projects.[2]

1. A former Assistant Commissioner, U.S. Bureau of Reclamation has stated the following:

 "That reclamation in the West is a wealth-creating undertaking is apparent to anyone who has traveled west of the 100th meridian. When semiarid deserts of sagebrush and cactus are cleared and converted into farms, town, and cities, not only does the reclaimed land provide thousands of homes and produce crops and livestock, but it also supports factories and shops, creating land values and taxable wealth where none existed before.

 "When land is irrigated for the first time, it creates wealth of local and national value. When farms are settled, the necessities of life must be provided their occupants. While much food comes from the farm itself, supplemental food supplies such as sugar, salt, and flour must come from a store. Hardware, farm machinery, clothing, and furniture must all be purchased. The business thus created brings into existence or expands commercial enterprises of all kinds. Subsidiary businesses such as transportation, insurance, and real estate appear. Professional services in medicine, engineering, law, and accounting are required to serve each new or expanded farming area. Government services such as the post office and agricultural advisers are needed. Community services—churches, banks, and recreation centers—appear. A large population is soon living an urban life de-veloped by the needs and demands of the farm life brought into existence by irrigation water." GOLZÉ, RECLAMATION IN THE UNITED STATES 77–79 (1961).

2. President Theodore Roosevelt in his various Annual Messages had urged such a program:

 "The object of the Government is to dispose of the land to settlers who will build homes upon it. To accomplish this object, water must be brought within their reach * * * The benefits which have followed the development of the past justify the Nation's aid and cooperation in the more difficult and important work yet to be accomplished." —First Annual Message, December 3, 1901.

 "The nation as a whole is, of course, the gainer by the creation of these homes, adding as they do to the wealth and stability of the country, and furnishing a home market for the products of the East and South."—Third Annual Message, December 7, 1903.

 "The conservation of our national resources and their proper use constitute the fundamental problem which underlies almost every other problem of our national life * * * We must show foresight, we must look ahead * * * Our great river systems should be developed * * * The Government dams should be used to produce hundreds of thousands of horsepower * * * Irrigation should be far more extensively developed than at present * * *

The Agricultural Improvement District Act of 1922, specifically relates organization of such a district to owners of lands "which have at any time been recognized as within the exterior boundaries of a United States reclamation project". Chapter 23, Laws 1922, 1st S. S., now incorporated in A.R.S. § 45–903.

The original Salt River reclamation project, out of which the District eventually evolved, was authorized by the Secretary of the Interior on March 14, 1903, in accordance with the Reclamation Act. Prior to the authorization of the present District, the Salt River Valley Water Users' Association was incorporated on February 9, 1903, under the general corporation laws of the Territory of Arizona, for the purpose of furnishing "water for irrigation, power for domestic and ordinary purposes, and drainage." Reclamation Project Data, supra, p. 664.

The next pertinent congressional action was the Act of April 16, 1906, c. 1631, § 5, 34 Stat. 117, now codified as 43 U.S.C.A. § 522, which authorized the Secretary of the Interior to lease any surplus power or power privilege arising under any project undertaken under the Reclamation Act of June 17, 1902.[3] Further developments during this period are indicated in the opinion of this Court in Orme v. Salt Riv-

---

The work of the Reclamation Service in developing the larger opportunities of the western half of our country for irrigation is more important than almost any other movement."—Sixth Annual Message, December 3, 1906.

3. GOLZÉ, op. cit. supra at 69–70.

"The entrance of the Federal Government into power production in the Western States was purely incidental. While the possibilities of the Western streams for hydroelectrical generation was early recognized, the original Reclamation Act of 1902 made no specific provision for such generation or for sale of power. This was not entirely an oversight, as the General Land Office, in reporting to the Secretary of the Interior in February, 1902, on the proposed reclamation bill then pending in Congress, recommended that provision be made for the development and sale of power. The Secretary and the Congress, however, did nothing about the recommendation of the General Land Office.

"The Bureau of Reclamation proceeded with the production of small amounts of hydro power for construction purposes. The first annual report of the Bureau, published in 1903, in describing plans for Roosevelt Dam on the Salt River in Arizona, stated that a hydroelectric plant would be built to provide power for drilling purposes, handling rock, mixing and handling mortar, and crushing the rock used in concrete. It built a temporary plant of 1,300 horsepower in a cave of the canyon wall and constructed a 19-mile canal to bring water to it from the Salt River. In 1909 the plant was converted to permanent use, with a capacity of 15,400 kilowatts produced by the head of water behind Roosevelt Dam. * * *

"Congress amended the oversight of the original Reclamation Act by the Act of Apr. 16, 1906, which authorized the government to lease surplus power, giving preference to municipal purposes. Revenues from the sale of power were credited against the construction of the power plant and the reclamation project on which it was located."

er Valley Water Users' Association, 25 Ariz. 324, 217 P. 935 (1923). We quote as follows:

" * * * [O]n June 25, 1904, the association entered into a contract with the United States providing for co-operation between the association and its shareholders and the United States government in the construction of a reservoir on Salt river, which reservoir was constructed and has been in operation since 1910 and is known as the Roosevelt reservoir; that a highly developed irrigation system has been constructed for the benefit of the lands of the association's shareholders and was operated by the United States Reclamation Service up to September 6, 1917, when the United States government and the association, after its stockholders at an election held for that purpose had authorized such action, entered into a further contract by which the operation, maintenance, and control of said irrigation system were vested in said association upon the terms therein provided, subject, however, to be terminated by either party in the manner therein stated, and the payment of the construction charges * * * due the United States * * * was assumed by the association; that under said contract the association has, since October, 1917, operated and maintained, and is

now operating and maintaining, the aforesaid irrigation works, * * *." Id. at 330–331, 217 P. at 937–938.

The Secretary of the Interior was authorized to transfer the management and operation of irrigation works to local associations under the Act of June 17, 1902, c. 1093, § 6, 32 Stat. 389, or under the Act of August 13, 1914, c. 247, § 5, 38 Stat. 687, now codified as 43 U.S.C.A. §§ 498, 499, respectively.

Following the transfer of the operation and management of the irrigation system to the local association in the Salt River reclamation project, Congress passed an amendment to the Act of April 16, 1906, titled the Act of September 18, 1922, c. 323, 42 Stat. 847, now codified as 43 U.S.C.A. § 598. This act provides as follows:

"Whenever a development of power is necessary for the irrigation of lands under the Salt River reclamation project, Arizona, *or an opportunity is afforded for the development of power* under said project, the Secretary of the Interior is authorized, giving preference to municipal purposes, to enter into contracts for a period not exceeding fifty years for the sale of any surplus power so developed, and the money derived from such sales shall be placed to the credit of said project for disposal as provided in the contract between the United States of

America and the Salt River Valley Water Users' Association, approved September 6, 1917. *Provided*, That no such contract shall be made for the sale of such surplus power which will impair the efficiency of said project: *Provided, however,* That no such contract shall be made without the approval of the legally organized water-users' association or irrigation district which has contracted with the United States to repay the cost of said project: *Provided further*, That the charge for power may be readjusted at the end of five, ten, or twenty year periods after the beginning of any contract for the sale of power in a manner to be described in the contract." (Emphasis supplied.)

Turning to legislative developments on the State level, we find that the Arizona Legislature enacted the Agricultural Improvement District legislation in 1922. The first six paragraphs of what is now A.R.S. § 45–903, subsection A were first enacted as § 1, Chapter 23, Laws of 1922. Subsequent developments on the State level can be found in this Court's opinion in Reichenberger v. Salt River Project Agricultural Improvement and Power District, 50 Ariz. 144, 70 P.2d 452 (1937). There we said the following:

"Districts of a nature like that of our agricultural improvement districts have been authorized in a number of the western states, and many questions have arisen as to the character, powers, and rights of these districts. One of the most frequent questions has been the extent to which they are subject to various constitutional limitations, and in determining such questions it has frequently been necessary to decide whether the district was a private corporation, a municipal corporation, or an organization of some other character, for upon the answer to this question would depend what constitutional limitations applied to them.

"The officers of the association evidently came to the conclusion that there was perhaps some authority for a conclusion that these districts were municipal corporations in the fullest sense of the word, subject to the limitions imposed by law upon such corporations, and with correlative rights. Among the important rights granted to municipal corporations, under the Constitution of Arizona, is that of exemption from any form of taxation, both as to their property and securities issued by them. It, therefore, occurred to the officers of the association that if a district could be organized under the agricultural improvement district act which would issue its bonds for the purpose of providing money to take up the outstanding bonds of the association, the bonds of

the district, for reasons which are too well known for discussion, could be placed at a much lower rate of interest than those issued by the association as a private corporation, and the stockholders of the association, who, of course, would ultimately pay the district bonds, would thus be saved a very large sum of money each year. A request was, therefore, made that the legislature amend the agricultural improvement district act by including among the purposes for which such districts might be organized, the following:

"'* * * or to reduce the cost of irrigation, drainage and power to the owners of the lands in said district by the sale of surplus water or power produced, owned or controlled by the district, and the construction, maintenance, extension, replacement, financing, and refinancing of the works useful for said purpose; or to finance or refinance as its own obligation all or any part of the debt heretofore incurred or hereafter proposed to be incurred by any public or private agency in the construction, maintenance, improvement or replacement of the structures and equipment necessary or useful for the accomplishment of any of the above purposes;'

\* \* \* \* \* \*

"The Legislature, in 1936 (Laws 1st Sp.Sess. 1936, c. 10) complied with the request of the association and made the desired amendments. Thereafter, and for the sole purpose of carrying out the plan aforesaid, the officers of the association caused a district to be organized under the act, which was in substance, though not in law, the *alter ego* of the association; provided for the issuance by the district of $13,000,-000 of its bonds, and then caused a contract to be entered into between the district and the association, the substance of which was that the district was to issue bonds and turn the proceeds over to the association, and levy the necessary taxes to pay the bonds as they became due, while the association was to use the proceeds of the bonds to pay off $13,000,000 of its outstanding indebtedness, and then collect from its members a sufficient amount of money to reimburse the district for the amount of taxes it was compelled to levy to meet the new bonds. \* \* \*" Id. at 149–151, 70 P.2d at 454–455.

The events following the 1936 amendments, which added the present paragraphs 7 and 8 to A.R.S. § 45–903, subsection A are related in City of Mesa v. Salt River Project Agricultural Improvement and Power District, 92 Ariz. 91, 373 P.2d 722 (1962) as follows:

"On or about March 22, 1937, the Salt River Valley Water Users Association, subject to the rights of the United States, transferred and assigned all its properties, real and personal, and rights therein, and all water and power rights, franchises and privileges to the District but continued to operate the works and facilities. In September of 1949 the District assumed and took over the maintenance and operation of the electric power system from the association and has continued the maintenance and operation to the present time, constructing canals, laterals and electric transmission and distribution lines over and along certain rights of way theretofore granted by the United States and the individual landowners." Id. at 95–96, 373 P.2d at 725.

*Implementation of Reclamation Policies*

■ From this historical survey it becomes apparent that the Federal and State legislation are part of a comprehensive scheme designed to effectuate the reclamation policies in the State. To understand how these policies can best be made effective, it is necessary to examine the purpose of the Legislature in enacting the respective statutes. When state legislation is enacted to take advantage of federal legislation, this Court will refer to congressional legislative history to aid it in ascertaining legislative intent. Cf. Truck Insurance Exchange v. Hale, 95 Ariz. 76, 80, 386 P.2d 846, 848 (1963).

■ Petitioners argue that an agricultural improvement district may not lawfully sell electric energy generated without regard and unrelated to any power requirement or hydro generating potential of the District and its reservoirs. The requirement of a relationship to a power need of the District is negated by the legislative history preceding the Act of April 16, 1906. The following appears in the House Report to accompany Senate Bill 87 (which became the 1906 Act):

"In the development of irrigation projects it sometimes occurs that the development of power is necessary and feasible for the pumping of water for irrigation. In such cases the Secretary is authorized by section 5 of the act to lease surplus power not needed for irrigation purposes. It will also often occur in the construction of irrigation works that an opportunity will be afforded by a drop in a canal, regulation of stream flow, or otherwise to *develop power not needed in connection with the project,* and it was deemed wise to authorize the Secretary to lease such power opportunities or privileges. * * *" (Emphasis supplied.) H.R.Rep. No. 2113, 59th Cong., 1st Sess. 2 (1906).

The suggested requirement that there be a relationship between the hydro generating potential of the District and the surplus power sold overlooks the fact that the statutory phrase in A.R.S. § 45–903, subsection A, paragraph 7 is "surplus * * * power *produced, owned or controlled* by the district * * *." (Emphasis supplied.) To require this sort of relationship would make the word "produced" the only operative word and would reduce the words "owned or controlled" to mere surplusage.

A federal decision interpreting the authority of the Secretary of the Interior in managing a federal reclamation project in Idaho pursuant to the Act of April 16, 1906, 43 U.S.C.A. § 522, lends support to the views expressed above. See Burley Irr. Dist. v. Ickes, 73 App.D.C. 23, 116 F.2d 529 (1940), cert. denied 312 U.S. 687, 61 S.Ct. 614, 85 L.Ed. 1124 (1941). In managing the Minidoka Project the Secretary of the Interior had developed a profitable commercial power business. However, because of water shortages during some of the seasons of the year, it was impossible to supply both the power requirements of the District for pumping irrigation water and the commercial power requirements. To maintain both power requirements, the Secretary embarked upon a "conservation plan" which the Court described as follows:

"Prior to the shortage of 1931–1935, the Secretary had supplemented the power generated at the Minidoka plant by bringing in power from outside sources, thereby preserving the commercial business and its profits. But with the shortage, further measures of conservation became necessary both to fulfill irrigation requirements in the project, including the district, and to *preserve the commercial business.* The Secretary therefore instituted a plan to accomplish these ends. In broad outline it involved cessation of winter operation of the Minidoka plant and storage of the winter flow thereby conserved in the project reservoirs, principally at American Falls, for summer use. But to avoid destruction of the commercial business, the Secretary arranged to bring in 'firm' power from an outside source to supplement what the plant would generate. He accomplished this by an agreement, effective October 1, 1934, with the Idaho Power Company, a private utility, which provided, in effect, for an exchange of power between that company and the Government's Black Canyon power plant on the Payette River in western Idaho. The Idaho Company generated power for commercial sale at its plant located at American Falls. It agreed to deliver power from this plant for dis-

tribution to the consumers of commercial power within the Minidoka project, replacing that formerly generated at Minidoka during the winter and supplementing that produced there in the summer, so that there would be no interruption either of commercial sale or of irrigation pumping. In exchange for this power, the company receives power from the Government's Black Canyon plant, not part of the Minidoka project, which it distributes to customers in the region of that plant." 116 F.2d at 536. (Emphasis supplied)

In passing on the propriety of the Secretary's action, the Court said:

"The crux of the matter is in the findings that execution of the plan was essential for the plaintiff's benefit, both to supply the necessary power for pumping and to preserve and maintain the commercial power business. These findings were supported amply by the evidence. They show that 'no successful commercial power business could have been carried on during the year 1935 or any of the succeeding years without the power brought in from outside sources and delivered to the Minidoka Project by the Idaho Power Company'; that the demand for power for irrigation, mainly in the Burley District, 'absorbed the entire power output and entire power capacity of the Minidoka power plant during the summer and left no surplus power whatever available from that source during the peak of the irrigation season to carry on the growing commercial, domestic and industrial power business of the Minidoka Project'; that 'firm' power was required to operate that business, could not be produced by the Minidoka plant whether or not the winter flow was allowed to continue, and was available only from sources outside the project; and that the plan adopted by the Secretary resulted not only in saving about 250,-000 acre-feet of water for irrigation, including expanding requirements of the Burley District, but also 'in saving and preserving the profitable commercial power business on the Minidoka Project, which would otherwise have been lost through lack of a dependable source of power during the irrigation season.'

"In the face of these findings, there can be no question that the Secretary's action in placing the plan into effect was essential (1) to fulfill plaintiff's requirements for power for irrigation and (2) to preserve the commercial business, without which there would have been no profits to share. In these circumstances he had lawful authority to stop the flow of winter wa-

ter and cease generating winter power at the plant. \* \* \* " 116 F.2d at 540–541.

The Court stated the following with respect to the limits on the sale of surplus power:

"Disposition of surplus power, not required for pumping or other uses of irrigation, for commercial uses is authorized by an amendatory act of April 16, 1906, \* \* \*. But the development and sale of such power is authorized only as an incidental phase of reclamation, not as a primary or independent end in itself. The statute and its amendments are *reclamation* acts, not commercial power development acts. The legislation is entirely inconsistent with the development and sale of commercial power *whenever that may interfere with the development of irrigation or 'impair the efficiency of the irrigation project.'* To assure that the secondary conservation of power will not impair the primary conservation of water for irrigation, the authority to dispose of surplus power is vested exclusively in the Secretary and is circumscribed by limitations upon the manner, term and purpose of the disposal wholly inconsistent with permanent appropriation of power to non-irrigating uses and with subordinating irrigation to commercial sale." (Emphasis supplied). 116 F.2d at 530–531.

The case cited above supports respondent District's contention that the limitation placed on its authority to sell surplus power is cast in terms of the effect of such sales on the District's efficient operation of its irrigation functions. Further support for this contention is found in the Federal statute which is the predecessor of our own State statute and which provides as follows:

"Whenever a development of power is necessary for the irrigation of lands under the Salt River reclamation project, Arizona, or an opportunity is afforded for the development of power under said project, the Secretary of the Interior is authorized, giving preference to municipal purposes, to enter into contracts for a period not exceeding fifty years for the sale of any surplus power so developed, and the money derived from such sales shall be placed to the credit of said project for disposal as provided in the contract between the United States of America. and the Salt River Valley Water Users' Association, approved September 6, 1917. *Provided,* That no contract shall be made for the sale of such surplus power *which will impair the efficiency of said project*: \* \* \*." (Emphasis supplied.) 43 U.S.C.A. § 598.

Moreover, the transaction in question in the instant case fits into the rationale sup-

porting the validity of the transaction undertaken in Burley Irr. Dist., supra. The testimony relative to the reason for the contractual arrangements was as follows:

"Q. Mr. Brandow, why has the Salt River Project contracted with the United States Bureau of Reclamation and with Colorado-Ute Electric Association, Inc., for the purchase of this considerable amount of power and energy? "A. In reviewing our annual growth, the Salt River Project anticipates a demand of 893 megawatts in 1965, increasing to approximately 1,409 by 1970. To meet this deficiency, the Salt River Project made formal contracts with the Bureau of Reclamation and Colorado-Ute as our present resources are only 720 megawatts, and the deficiency by these contracts will be made up to make our normal commitments in 1965; and the other by 1970 will be other anticipated steam-generated plants located somewhere in the north.

\* \* \* \* \* \*

"Q. What factors are taken into consideration in projecting or determining or estimating future loads of the Salt River Project?

"A. There are several factors, including the historical data of the prior years and the use of business's estimates of the growth of population in our service area." (R.T. May 20, 1963 pp. 58–60)

■ Accordingly, we hold, by analogy to the Burley case, supra, and in light of the legislative history of the Federal and State statutes, that the District is not required to show, in addition to the subsidy relationship existing between the use of its power revenues to support its irrigation and reclamation functions, that the surplus power which it sells is needed in part for irrigation purposes or that such power is developed in relation to its hydro generating potential. It must, however, at all times be evident that the power development and sale is "an incidental phase of reclamation, not a primary or independent end in itself."

*Power of Eminent Domain*

Secondly, petitioners contend that the taking is outside the statutory delegation of the eminent domain power because the District will hold the property in trust for the United States Government. While conceding that in some instances a state may condemn for the benefit of the Federal Government, they contend that the delegated power to do so cannot be found in any statute. Their argument, stated in detail, is as follows: The taking authorized by the order for immediate possession contravenes the pertinent statutes and the authority thereby delegated to the District, in that the property proposed to be taken thereby,

if taken, (1) will be held by the District as agent and as trustee for the United States; (2) will not be used or useable for District purposes as set forth in the Improvement District Act; (3) will be wholly within the control of the Secretary of the Interior, whose authority by reason thereof supersedes state law and regulation contrary to the requirements of said state statutes, and (4) said property may not be sold or otherwise conveyed by the District but must be held subject to the controlling authority of the United States.

We are of the opinion that petitioner's contention is untenable. Upon examining the statutes we find that A.R.S. § 45–939 provides as follows:

"*Condemnation proceedings may be brought by the board of directors in the name of the district,* and all laws of the state relating to the exercise of the right of eminent domain and the taking of private property for public purposes and obtaining immediate possession thereof shall apply to the proceedings. The use of the property which is condemned, taken or appropriated under the provisions of this chapter is declared to be a public use, subject to regulation and control by the state in the manner provided by law." (Emphasis supplied.)

Thus, it is clear from this statute that the District may institute condemnation proceedings. The question therefore is: does a Federal interest in the property condemned invalidate the District's authority to condemn? The legislative history behind the pertinent provisions shows that it does not. In 1934 during its 3rd Special Session, the Arizona Legislature enacted Chapter 6, Laws of 1934. The purpose clause of this chapter provides in pertinent part as follows:

"AN ACT: Authorizing irrigation districts, drainage districts, flood control districts, *agricultural improvement districts*, electrical districts, power districts and other districts as defined herein, to enter into contracts or agreements with the federal government or any officer, agency, corporation or instrumentality thereof; * * *."

Section 5 of the Act (now codified as A.R.S. § 45–2163, subsec. D) provides that the District's powers in a contract with the Federal Government include the following:

"That by any such contract or agreement, the district may agree that the Federal Government, or any such public or private agency, or corporation, may assume or may liquidate, compromise, pay or discharge, all or any part of the indebtedness of the district; may agree that the stock or other evidence of the ownership or interest of the district in any such private corporation or agency, *as well as any other*

*properties of the district, may be placed or held in trust irrevocably* during the term of such contract or agreement or for such other period as may be prescribed in such contract; \* \* \*."

Thus, this legislation shows that in 1934 the Legislature was aware that the Federal Government might have an interest in District property as a result of contract. Two years later, in 1936, the Legislature enacted § 8, Chapter 10, Laws of 1936, 1st S.S. (now codified as A.R.S. § 45–940, subsec. B), which provides in pertinent part as follows:

"*The board* \* \* \* *shall also have the right and power*, for and in the name of and for the use and benefit of the district, *to exercise the right of eminent domain* and thereby take, hold and possess any and all such land and other property as may be necessary for the construction, use, maintenance, repair, improvement or extensions of any works necessary or useful for the purposes of the district."

Having empowered the District in 1934 to make contracts with the Federal Government whereby the latter would have an interest in District property, the Legislature was aware in 1936 that property taken under the power of eminent domain which it was then authorizing would also be subject to a possible Federal interest. This sequence of legislation clearly demonstrates

that the Legislature did not intend to render nugatory the power of eminent domain which it was granting because two years earlier it had authorized the District to place its properties in trust for the Federal Government.

■ Petitioners also submit that the last clause of A.R.S. § 45–939 which makes the property taken "subject to regulation and control by the state in the manner provided by law," provides a hurdle to these proceedings because of a supervening Federal interest precluding regulation by the State. However, a federal interest in the land does not mean, *ipso facto*, that the property taken would be in no manner "subject to regulation and control by the state in the manner provided by law." Howard v. Commissioners of Sinking Fund, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953); Silas Mason Co. v. Tax Commission, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937); United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761 (1930).

In Silas Mason Co., supra, where suit had been brought to restrain the enforcement of the Occupation Tax Act of the State of Washington as applied to the gross income received by appellants under contracts with the United States for work performed in connection with the building of the Grand Coulee Dam on the Columbia River, the Court, in discussing the question whether the areas in which the work was

performed were within the exclusive jurisdiction of the United States, noted that "the reclamation of arid or semiarid lands has always been regarded as a project which carried with it an appropriate recognition of a continued state jurisdiction." 302 U.S. at 206, 58 S.Ct. at 243.

Accordingly, we hold that the District has been delegated power to condemn land even though the United States may have an interest in the land.

*Status of District as Municipal Corporation*

▆ Petitioners next assert that the public activities of the District are ultra vires its statutory authority and therefore it is a de facto public service corporation and hence not acting as a "municipal corporation" within the exemption of such municipal corporations found in Article 2, § 17, Arizona Constitution. The pertinent provisions of the Arizona Constitution are as follows:

> "[N]o right of way shall be appropriated to the use of any corporation *other than municipal,* until full compensation therefor be first made in money, or ascertained and paid into court for the owner * * *."

If petitioners are correct in their conclusion, the rule stated by this Court in Hughes Tool Company v. Superior Court, 91 Ariz. 154; 370 P.2d 646 (1962), would preclude respondent as a privately owned corporation from taking advantage of the immediate possession procedure authorized by A.R.S. § 12–1116.

To support their contention, petitioners refer us to Natural Gas Service Co. v. Serv-Yu Cooperative, 70 Ariz. 235, 219 P.2d 324 (1950). We find this case inapposite to the determination of the District's status for the purpose of being entitled to an order letting them into immediate possession. The Natural Gas Service Co. case, supra, was a declaratory judgment action to determine whether the plaintiff could be classified as a public service company for the purpose of subjecting it to public regulation. The factors listed in that opinion to determine classification for regulatory purposes are inappropriate to determine the classification for the purpose of being entitled to an order for immediate possession. To do so would cause this Court to commit the error against which Professor Walter Wheeler Cook warned when he wrote:

> "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against." COOK, LOGICAL AND LEGAL BASES OF THE CONFLICT OF LAWS 159 (1942).

Moreover, this Court has refused to accept the public service characterization of the District for regulatory purposes. Rubenstein Const. Co. v. Salt River Project Agr. Improvement & Power Dist., 76 Ariz. 402, 265 P.2d 455 (1953).

In Bugbee v. Superior Court, 34 Ariz. 38, 267 P. 420 (1928), this Court held that the right of way exemption provided for municipal corporations was not limited only to cities and towns, but was of sufficient breadth to include an irrigation district. Petitioners contend either that the Bugbee case, supra, was incorrectly decided or that irrigation districts are distinguishable from agricultural improvement districts for this purpose. We do not agree.

To accept either of petitioners' contentions would require the frustration of several Constitutional and statutory provisions. Article 13, § 7, of our Constitution provides in pertinent part as follows:

"[A]gricultural improvement * * * districts * * * now or hereafter organized pursuant to law, *shall be* political subdivisions of the State, and *vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this Constitution or any law of the State or of the United States * * *.*" (Emphasis supplied.)

Any further doubt about the District's status for the purpose of being entitled to an order of immediate possession is dispelled by the following statutory provisions:

"An agricultural improvement district organized under the provisions of this chapter is a public, political, taxing subdivision of the state, and *a municipal corporation to the extent of the powers and privileges* conferred by this chapter or *granted generally to municipal corporations by the constitution and statutes of the state,* including immunity of its property and bonds from taxation." (Emphasis supplied.) A.R.S. § 45–902.

"Condemnation proceedings may be brought by the board of directors in the name of the district, and *all laws of the state relating to* the exercise of the right of eminent domain and *the taking of private property for public purposes and obtaining immediate possession thereof shall apply to the proceedings.* * * *.*" (Emphasis supplied.) A.R.S. § 45–939.

Read together, these Constitutional and statutory provisions in light of the Bugbee case, supra, make it clear beyond cavil that the District is entitled to an order letting it into immediate possession of property which it is seeking to condemn.

It must be noted that our conclusion as to the District's status as a municipal corporation for the purpose of being entitled to immediate possession of property which it is seeking to condemn, is limited to that purpose only. We are not here concerned with nor do we express an opinion as to what may be the District's status as a municipal corporation for any other purpose than here discussed. Cf. Local 266, International Brotherhood of Electrical Workers v. Salt River Project Agricultural Improvement and Power District, 78 Ariz. 30, 275 P.2d 393 (1955).

### Equal Protection of the Laws

Finally, petitioners contend that they have been denied the equal protection of the laws in two respects: (1) That in eminent domain proceedings instituted by a municipal corporation, the condemnees are subjected to an order letting the condemnor into immediate possession, whereas a condemnee in a proceeding instituted by a private corporation is not subjected to such an order, and (2) that in an eminent domain proceeding brought by a municipal corporation the measure of damages differs from that awarded to a condemnee in a suit brought by a non-municipal corporation.

 In evaluating the merits of an equal protection argument we start with the rules stated by the United States Supreme Court as follows:

"1. The equal protection clause of the 14th Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary.

"2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality.

"3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.

"4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).

With respect to the equal protection argument as applied to the order letting the District into immediate possession, Dohany v. Rogers, 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930), is in point. The plaintiff there contended that he was denied equal protec-

tion of the laws when proceedings were brought to condemn his land under the Michigan highway condemnation act for eventual transfer to a railroad. He claimed that if the condemnation suit had been brought under the Michigan condemnation act applicable to railroads, he would have had the following greater rights and privileges: "(a) the right to possession of his property until damages have been finally assessed and paid; (b) the right to consequential damages for diminution in value of any part of the tract not taken; (c) the right to damages without deduction of benefits accruing from the construction of the railroad; (d) the right to attorneys' fees and expenses in addition to damages; (e) the right to trial by jury; and (f) the right to review by appeal instead of by certiorari." 281 U.S. at 365, 50 S.Ct. at 301. After noting that according to Michigan law there was no difference in the measure of damages under the two statutes and that the condemnee could not complain about the difference in awards of attorneys' fees, the Court held that the other procedural differences did not constitute a denial of equal protection as follows:

"Nor does the equal protection clause exact uniformity of procedure. The legislature may classify litigation and adopt one type of procedure for one class and a different type for another. That condemnation proceedings under the Highway Act are conducted on be-

half of the state is in itself sufficient basis for the exercise of the legislative judgment in providing for it a different procedure from that prescribed for the exercise of eminent domain by a private corporation." 281 U.S. at 369, 50 S.Ct. at 302.

Similarly, in Via v. State Commission on Conservation and Development, 9 F.Supp. 556 (W.D.Va.1935), affirmed 296 U.S. 549, 56 S.Ct. 245, 80 L.Ed. 388 (1935), where the plaintiff condemnee attacked the validity of a proceeding brought against him under a special rather than under the general condemnation statute, the Court held as follows:

"We are unable to take the view that the condemnation of these lands under the 'Public Park Condemnation Act,' instead of under the general condemnation act, constituted an arbitrary discrimination against the plaintiff, depriving him of due process and the equal protection of the laws. There can be no doubt that the state, in authorizing the Commission on Conservation to acquire lands for public parks, had a right to prescribe a different form or method of procedure from that under the existing general condemnation statute. If, because of the large number of tracts of land involved or for other reasons, the general statute was believed to be impracticable or awkward

of operation, the Legislature had an undoubted right to provide for condemnation by a procedure more conveniently fitted to the nature of the proceedings; provided, of course, that the new statute in itself was not invalid. And the mere fact that its provisions varied from those of the general statute did not render it invalid." 9 F.Supp. at 563.

See also Port of New York Authority v. Heming, 34 N.J. 144, 167 A.2d 609 (1961), appeal dismissed 367 U.S. 487, 81 S.Ct. 1676, 6 L.Ed.2d 1241 (1961) (holding that a condemnee was not denied equal protection of the laws by statutes permitting the Port of New York Authority to elect to proceed under either of two statutes, only one of which afforded a condemnee a jury trial).

■ Accordingly, we hold that there is a reasonable basis for classifying eminent domain procedures in granting to the State or one of its political subdivisions a different mode of procedure than that accorded private corporations. The history of Art. 2, § 17, as discussed in Hughes Tool Company v. Superior Court, 91 Ariz. 154, 370 P.2d 646 (1962), and Desert Waters, Inc. v. Superior Court, 91 Ariz. 163, 370 P.2d 652 (1962), affords sufficient reason to support a classification of these procedures according to whether the condemning agency is a municipal corporation vel non. We cannot gainsay the judgment of the framers of the Arizona Constitution that there exist special circumstances in relation to eminent domain procedures instituted by municipal corporations, which entitle them to a different treatment from "any corporation other than municipal."

■ With respect to petitioners' claim that they are denied equal protection of the laws because of a different measure of damages accorded them as opposed to that accorded condemnees whose property is condemned by a private corporation, we find that petitioners have not as yet been subjected to the application of the statutes whose validity they contest. Nor do they show that there is any likelihood that they will be subjected to these statutes. Thus their claim lacks the requisite elements of justiciability for this Court to pass judgment upon its merits. Judge Cardozo, in refusing to render an advisory opinion on a matter submitted to the New York Court of Appeals, stated the matter with his usual insight when he said:

"We are asked by an omnibus answer to an omnibus question to adjudge the rights of all. That is not the way in which a system of case law develops. We deal with the particular instance; and we wait till its arises." Matter of State Industrial Commission, 224 N.Y. 13, 17–18, 119 N.E. 1027, 1028 (1918). Cf. Rescue Army v. Municipal Court of

City of Los Angeles, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

At the conclusion of the hearing on the order to show cause why the District should not be let into immediate possession of the property the trial court found and ordered as follows:

"It is the order of the Court, for reasons heretofore stated, as well as the finding of this Court that the specific parcels still in issue and herein sought to be condemned are subject to a necessary and public use by the plaintiff.

"It is the finding of the Court that it is for the greatest public good and least private injury, and the plaintiff is granted an order for immediate possession upon posting a proper bond and double the probable damages as shall be fixed by the Court * * *."

■ While it does not appear that the court made a specific finding that the District was seeking to exercise the power of eminent domain for purposes directly connected with its irrigation and reclamation functions, and not for sale of power as an independent end in itself, if there was evidence to sustain such a finding, upon this issue, we will assume that the Court based its order upon such a finding. Lenslite Co. v. Zocher, 95 Ariz. 208, 388 P.2d 421 (1964). There was testimony to the effect that additional power would be needed to supply the demands of municipal and commercial users with whom the District had long since entered into contracts to supply power. There was testimony that because of increasing costs of irrigation, additional power was needed to supply owners of irrigated land in the District. There was additional testimony that receipts from the development and sale of power would be used against the cost of furnishing irrigation water. There was considerable evidence to the effect that the District would need additional power to supply commitments made by contract, and that the receipts would be used to apply against the cost of furnishing irrigation water in the reclamation project. We are of the opinion such evidence amply justified a finding that the District was therefore seeking to exercise the power of eminent domain for purposes directly connected with its irrigation and reclamation functions.

■ We therefore hold that: (1) The real party in interest, Salt River Project Agricultural Improvement and Power District, is authorized under the provisions of the statutes relating to powers of an agricultural improvement district to sell surplus power produced, owned, or controlled by respondent District; (2) that "surplus" power means power produced, owned, or controlled by the District which is in an amount beyond that needed by the landowners of the District, regardless of whether it was produced as a result of the irriga-

tion and drainage functions of the District, or otherwise acquired; (3) that such "surplus" power must be produced, owned or controlled only in relationship to the use of power revenues to support its primary irrigation and reclamation functions; (4) that for the purposes of development of arid and semiarid land as recognized and authorized by Congress and implemented by Arizona statutes and by Article 13, § 7 of the Arizona Constitution, the District is a municipal corporation; (5) that for the purpose of sale of surplus power as an incidental phase of reclamation, the District is entitled to exercise the power of eminent domain as a municipal corporation pursuant to the provisions of Article 2, § 17 of the Arizona Constitution; (6) that the District is entitled to immediate possession of the land in question.

The trial court did not exceed its jurisdiction in issuing the order letting the District into immediate possession of the lands in question.

The order is affirmed, and the case remanded for such further proceedings as are necessary in the condemnation suit.

STRUCKMEYER, V. C. J., and UDALL, J., concurring.

BERNSTEIN, Justice (specially concurring).

I cannot agree with the reasoning by which the majority reaches its result. The condemnation involved in this suit is for a transmission line necessary for the delivery of interchange power to the Salt River Project. I agree with the majority that the Salt River Project is a municipal corporation for all purposes relevant to this case. I also agree that the condemnation procedure used here is lawful.

The only question in this case is whether Salt River Project has authority to condemn the land described in its petition in the Superior Court. We need not pass upon the suggestion that the Project can go into the power business anywhere in the state so long as it uses its profits to decrease the cost of irrigation within the district. The answer to this suggestion would seem obviously to be "No". The majority decision goes much further than we need go to dispose of this case. It is enough to say that this land may be condemned, and to leave broader questions to the legislature or to future litigation with other parties and a fuller record.

However, since the majority goes into the problem of the extent of the authority which has been delegated to the District pursuant to the legislation under which it is presently operating, it is appropriate for me to give my views on the question.

I agree that the federal legislation is pertinent. Since 1902, all state reclamation legislation has been enacted under the stimulus of federal programs, and the same

has been true of state electric power legislation for the last 30 years. When federal funds are to be advanced, federal requirements may determine the exact wording of the legislation. However, Truck Insurance Exchange v. Hale, 95 Ariz. 76, 386 P. 2d 846 relied upon by the majority to read federal legislative history into the Arizona statute, dealt with the McCarran Act, 15 U.S.C.A. § 1011 et seq. which specially authorized state regulation of the insurance industry. The field preempted by Congress was relinquished to the states on the condition that the state would regulate the insurance industry. Certainly the intent of Congress was controlling. Here also, the federal acts under which funds were made available to the District in 1936 are relevant to an understanding of the legislation enacted in that year to enable the District to participate in the then existing federal programs. Truck Insurance Exchange stands for no more. If Congress broadens the powers of the Secretary of the Interior or other federal officials, state agencies deriving their powers from the state legislature, must have similar broadening legislation. The legislature, in 1936, did not force, and did not authorize the District to cooperate with a program of the federal government not conceived until almost 30 years later.

Where a municipal corporation is involved, specific legislative authority must be found for all of its activities. Judge Dillon in his classic work on Municipal Corporations, expressed the rule in the following language:

"§ 237 (89). Extent of Power; Limitations; Canons of Construction.—It. is a general and undisputed proposition of law that *a municipal corporation possesses and can exercise the following powers and no others*: First, those granted in *express words*; second, those *necessarily or fairly implied* in or *incident* to the powers expressly granted; third, those *essential* to the accomplishment of the declared objects and purposes of the corporation,—not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. Of every municipal corporation the charter or statute by which it is created is its organic act. Neither the corporation nor its officers can do any act, or make any contract, or incur any liability, not authorized thereby, or by some legislative act applicable thereto. All acts beyond the scope of the powers granted are void. Much less can any power be exercised, or any act done, which is forbidden by charter or statute. *These principles are of transcendent importance, and lie at the foundation of the law of municipal corporations.* Their reasonableness, their necessity, and

their salutary character have been often vindicated, but never more forcibly than by the learned Chief Justice Shaw, who, speaking of municipal and public corporations, says: '*They can exercise no powers* but those which are conferred upon them by the act by which they are constituted, or such as are necessary to the exercise of their corporate powers, the performance of their corporate duties, and the accomplishment of the purposes of their association. This principle is derived from the nature of corporations, the mode in which they are organized, and in which their affairs must be conducted.' " (Emphasis in original.)

An analysis of the legislation conferring power on the Salt River Project convinces me that the extensive power activities of the Salt River Project, and particularly the contract here involved, to generate power in Colorado and New Mexico and exchange it for power from Glen Canyon Dam to be brought to the Salt River Project over the transmission line involved in this case, has not been authorized by the state legislation governing agricultural improvement districts.

When the Federal Bureau of Reclamation was first organized it was not given authority to sell power. Today, its power activities may overshadow its irrigation activities. For example over 50% of the revenue from the Central Project in California will come from power production. See Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313. With regard to an appropriation for the Columbia Basin Project, the Court of Claims has held that Congress has power to change its standing policy that the primary purpose in Reclamation Laws was irrigation, and to give primacy to hydro-electric development. Winston Bros. Company v. United States, 130 F.Supp. 374, 131 Ct. Cl. 245.

Increased emphasis on power is notable in the Water Supply Act of 1958 which is Title III of the Flood Control Act of 1958, 72 Stat. 319, now 43 U.S.C.A. § 390b et seq. and the Colorado River Storage Project Act of 1956, 70 Stat. 105, 43 U.S.C.A. § 620 et seq. Secretary of the Interior may construct transmission lines to deliver power to purchasers under these acts.

Golzé, cited by the majority, supra note 1, classifies the Salt River Project as a single purpose project. The first multipurpose project was Hoover Dam in 1928, and the first river basin project the Missouri River in 1944. The Colorado River Storage Project from which the power here involved will come is a river basin project dependent upon pooling the revenues from the power facilities to aid in repaying the cost of construction of irrigation projects.

There has been no corresponding expansion of the authorization for power activities of the Salt River Project in the state legislature. In 1922 Federal policy was changed so that contracts were no longer made by the Reclamation Service directly with landowners, but joint liability contracts could be made with districts. Act of May 15, 1922, 42 Stat. 541. In the same year, the Arizona Legislature authorized the creation of Agricultural Improvement Districts, Ch. 23, Laws 1922, now A.R.S. § 45–901 et seq., modeled after California legislation which has since been superceded. The only reference to power was in section 45–903, subsection A, paragraph 6 which reads "to provide power * * * for the use of the owners or occupants of such lands."

The Act authorized the creation of agricultural improvement districts by five or more holders of title within the exterior boundaries of a United States reclamation project. It was under this Act that the Salt River District was organized in 1937, after amendments had been adopted. Prior to 1937, the Salt River Project relied upon the authorizations in its articles of association for its power activities, and the activities as they were carried on at that time were approved by this court. Bethune v. Salt River Valley Water Users' Ass'n., 26 Ariz. 525, 227 P. 989.

The 1936 amendments of A.R.S. § 45–903 were adopted to make possible a federal plan for refinancing. The Water Users' Association power revenue was definitely contemplated as a security for bonds to be issued. See, Reichenberger v. Salt River Project, etc., 50 Ariz. 144, 70 P.2d 452. Subsection A, paragraph 7 was added to A.R.S. § 45–903 in 1936 at the request of the Water Users' Association. It reads as follows:

"To reduce the cost of irrigation, drainage and power to the owners of the lands in the district by the sale of surplus water or power produced, owned or controlled by the district, and the construction, maintenance, ; extension, replacement, financing and refinancing of the works useful for such purpose."

It is in this section that the majority finds authority for the interchange agreement. I do not read it so broadly.

In Kaukauna Water-Power Co. v. Green Bay, etc., Canal Co., 142 U.S. 254, 273, 275–276, 12 S.Ct. 173, 177, 178–179, 35 L.Ed. 1004, the Supreme Court of the United States stated the allowable limits upon a municipality in creating a "surplus." The Supreme Court said:

"But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the State may not

retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement.

\* \* \* \* \* \*

"The true distinction seems to be between cases where the dam is erected for the express or apparent purpose of obtaining a water-power to lease to private individuals, or where in building a dam for a public improvement, a wholly unnecessary excess of water is created, and cases where the surplus is a mere incident to the public improvement, and a reasonable provision for securing an adequate supply of water at all times for such improvement. No claim is made in this case that the water-power was created for the purpose of selling or leasing it, or that the dam was erected to a greater height than was reasonably necessary to create a depth of water sufficient for the purposes of navigation at all seasons of the year. So long as the dam was erected for the bona fide purpose of furnishing an adequate supply of water for the canal, and was not a colorable device for creating a water-power, the agents of the state are entitled to great latitude of discretion in regard to the height of the dam and the head of water to be created; and, while the surplus in this case may be unneces-

sarily large, there does not seem to have been any bad faith or abuse of discretion on the part of those charged with the construction of the improvement."

"Surplus power" is discussed in, among other cases, Light v. City of Danville, 168 Va. 181, 203–206, 190 S.E. 276, 285; Holmes v. City of Fayetteville, 197 N.C. 740, 150 S.E. 624, 626; Public Service Co. of Colorado v. City of Loveland, 79 Colo. 216, 245 P. 493, 499. The right to sell surplus power is based upon the dictates of common business prudence, but I find no case where the production of surplus power for sale outside the municipality is permitted to overshadow the primary enterprise.

Surplus power is not objectionable so long as it is a normal and natural incident to the operation of the project. That is, it does not appear to have been an obvious excess built with a knowledge and deliberately planned as a subterfuge to create surplus. If it is merely an incident to operation of the project it is acceptable, but if it clearly appears to be built to create excess surplus power it is bad.

I do not find Burley Irr. Dist. v. Ickes, 73 App.D.C. 23, 116 F.2d 529 (1940), cert. denied 312 U.S. 687, 61 S.Ct. 614, 85 L.Ed. 1124, helpful to the majority in this case. It involved the division of profits from the resale of power to commercial customers. The power was received from the

Idaho Power Company *by the Secretary of Interior*, under an interchange agreement. The power replaced and supplemented power which could have been generated by a dam in which two irrigation districts had an interest. The dam was not operated for power purposes during a portion of the year, because it was closed down to conserve all of the water for later use in irrigation.

Judge Wiley Rutledge held that the Secretary of the Interior had power to execute a plan of conservation whereby he stopped the winter flow of water through a power plant in an irrigation district, ceasing to produce power during the nonirrigating season in order to conserve water for irrigation and contracted with a private power company to supply commercial demands in the district, thus preserving the profitable commercial power business which would otherwise have been lost because of lack of dependable power.

In Burley the Secretary acted in an emergency. Power was not available because of a water shortage. Farms would have been without sufficient water and existing profitable commercial business would have been lost if this plan had not been adopted. Here the projected electrical needs of the project are based upon future growth in the area. There is no showing that without this transmission line existing customers must be cut off or existing contracts breached or that there will not be sufficient power to meet the needs of future customers within the boundaries of the district.

Burley indicates only that the courts will give favorable consideration to plans of conservation, so long as they are within powers granted by the legislature. "The statute and its amendments *are reclamation acts*, not commercial power development acts" (116 F.2d at 531. Emphasis in original)

In the 1936 amendments, A.R.S. § 45–903, subsection A, paragraph 7, the legislature continued the authority for power activities which had been undertaken by the Water Users and approved by this court in Bethune. It approved the plans being made by the Salt River Project, in cooperation with federal agencies, and in broad terms authorized the contracts necessary to carry them out. A.R.S. § 45–936, subsection A, paragraph 4. This legislation was not a blank check authorization to go into the power business, nor an advance adoption of any new power policy which the federal government might thereafter follow. The Act remained a reclamation act, and reclamation, not power, is still its primary purpose.

The legislature again had an opportunity to bring the state legislation in line with present day federal electrical power policies in 1963, when it adopted A.R.S. § 45–

2201 et seq. It did not do so. Although the committee which reported to the legislature knew of the contract which is the basis for this suit, the legislature neither forbade or authorized it. Under the principles of law governing municipal corporations, authorization was necessary. Silent acquiescence is insufficient in this situation. Dillon, supra.

The fact that broader authority was specifically conferred on the Secretary of Interior with regard to the Salt River Project, by the Act of September 18, 1922, 42 Stat. 847, 43 U.S.C.A. § 598, does not increase the authorized powers of the Project. 43 U.S.C.A. § 598 reads:

> "Whenever a development of power is necessary for the irrigation of lands under the Salt River reclamation project, Arizona, *or an opportunity is afforded for the development of power under said project, the Secretary of the Interior is authorized*, giving preference to municipal purposes, * * *" (Emphasis supplied.)

This statute is, by its express terms, an authorization to the Secretary of the Interior. Congress could not, and did not, attempt to confer powers under 43 U.S.C.A. § 598 on a district which the state did not create until years afterwards.

Similarly, Bethune, supra, and Orme v. Salt River Valley Water Users' Assn., 25 Ariz. 324, 217 P. 935, dealt with the powers of the Water Users' Association under its charter. In Bethune we said:

> "It is obviously to the advantage of the association, which has impounded the waters at great cost, and partly developed the power supplied by such waters, to complete such development, and to retain control of the waters at all points from the outlet at the reservoir to their application directly to the lands of the shareholders of the association. Much of the power thus far developed by the various power plants of the association has been applied directly to the needs of irrigation, and some has been sold to be used for other purposes, and the proceeds applied to lighten the burdens of assessments to meet the cost of original construction. It is proposed to make similar use of the power resources of the works contemplated by this improvement.
>
> "The United States government has granted to the association a preference right to construct works at that place. *The articles under which the association is incorporated expressly prove 'that it may create, transmit, use, sell and dispose of power for the accomplishment of any of the purposes or objects of the association.'* The works contemplated by this project, if con-

structed, would be used like other units of its system, and in connection with such others for the development of electrical power precisely as such other elements of its system already constructed and now in use.

"What conclusion should be arrived at where it proposed or contemplated to construct such works wholly apart and independent of other parts of the association's system of irrigation work is not worth while here to consider. This question is entirely different from that. The principle involved in no way differs from the principle involved in the construction of other units of the same system. Orme v. Salt River Valley Water Users' Association, 25 Ariz. 324, 217 P. 935."

"We conclude, therefore, that the construction of these works already approved by the Secretary of the Interior, is not in contravention of any law, and is within the scope of business authorized by the association's articles of incorporation." (Emphasis supplied.) 26 Ariz. at 531, 533, 227 P. at 991, 992.

It was pursuant to this authority in the Water Users' articles of incorporation that the Horse Mesa Dam was constructed, and the proceeds of the contract with the Inspiration Consolidated Copper Company to sell power to it, were pledged as part of the security necessary for the bonds sold to finance the project.

The authorization to *create* power was not carried over into the Agricultural Improvement District Act.

This court has had occasion to consider the powers of the Salt River Project in entering contracts with labor organizations and upheld its power to enter such contracts in the same way that a private public service corporation might. Local 266, etc. v. Salt River Project Agr. Imp. & P. Dist., 78 Ariz. 30, 275 P.2d 393. Labor decisions involve many factors peculiar to labor relations problems, and are an unsafe guide in other fields. Protection of the rights of government employees may be achieved by civil service law or by contract, and it is not unusual to use the contractual method in the case of municipal corporations exercising proprietary functions. To do so casts no doubt on the basic municipal character of the Salt River Project.

The language of the court in City of Mesa v. Salt River Project Agr. Imp. & P. Dist., 92 Ariz. 91, 373 P.2d 722, should be read as descriptive of the activities of the Project in the "service area". That decision should not be read as approval of the activities described, as the issues of ultra vires and the basic powers of the Project were not raised in that case. Certainly that case clearly holds the Project

is not a public service corporation, as does Rubenstein Construction Co. v. Salt River Project Agr. Improvement & Power Dist., 76 Ariz. 402, 265 P.2d 455.

The general manager of the Salt River Project testified that the contract for power to be transmitted over the transmission line involved here was based upon the estimated future needs of the "service area" of the project, beginning with 1965. In view of the trial judge's order, we accept these estimates of need as being as reasonably accurate as estimates can be. Somebody must furnish this power over transmission lines to be located somewhere to the people within the area if Arizona is to continue to grow and prosper.

The "service area", however, is a factual and engineering concept not a legal entity. No legislation establishes a "service area" or sets up a procedure by which one may be established. The phrase is not used in any of the relevant legislation.

A map, showing the "Service Area of the Salt River Project" was introduced at the trial, and attached to the petition for certiorari. It shows the area referred to in the testimony. This area, on the map is divided as follows:

1. Area served exclusively by Salt River Project.

2. Area where the Salt River Project provides power requirements of Arizona Public Service for resale except for mining leads.

3. Area where the Salt River Project provides full power requirements of Arizona Public Service for resale.

4. Area served by Arizona Public Service.

5. Area served by City of Mesa.

In part the division of the "service area" was made by private arrangement between the Project and the Arizona Public Service Company. These arrangements were entered into in order to facilitate the sale of bonds of the Project. See City of Mesa v. Salt River Project Agr. Imp. & Power District, 92 Ariz. 91, 96, 373 P.2d 722, 726.

A private corporation, by its actions and representations, may incur an obligation to serve an area, to continue service, and to expand its service as demand increases. See Note, "Effect of rendering incidental service to members of the public to constitute an individual or corporation whose principal business is of a different nature a public utility," 18 A.L.R. 764. A public utility may be ordered to make additional capital investments. Arizona Corp. Comm. v. Tucson Gas, Electric Light & P. Co., 67 Ariz. 12, 19, 189 P.2d 907, 911. But a municipal corporation, even though authorized to sell surplus power or water outside its boundaries, incurs no such obligation, and its customers for surplus power may be cut

off if there is a deficiency for any reason. Long v. Town of Thatcher, 62 Ariz. 55, 65, 153 P.2d 153, 157; City of Phoenix v. Kasun, 54 Ariz. 470, 474, 97 P.2d 210, 212, 127 A.L.R. 84.

It is impossible, from the record before us, to determine at just what point the Salt River Project stepped over the line into ultra vires power activities. The testimony is directed to the projected needs of the "service area." It is clear that the Project is seeking to avoid a situation where it might be forced to cut off any of its "surplus" customers by making ample provision for the future. Although, as the majority points out, the Project's legal authority to sell power within its own boundaries comes from subsection A, paragraph 6, and its authority to sell "surplus power" anywhere it can find a customer comes from subsection A, paragraph 7, the testimony does not show the needs of these two areas separately, and this case has been considered as if "surplus power" were all that is involved. With regard to "surplus power" the Project cannot create a surplus upon a surplus, and expand indefinitely, under its present legislative authorization.

The present and proposed transactions of the Salt River Project in the development and transmission of additional "surplus" power are ultra vires. Unless the legislature gives specific authorization, in the manner traditionally used to grant powers to municipal corporations, further power activities are not authorized, and the Project's existing legal authority to go into the power business has long since been stretched to the limit. An incidental reference to "surplus power" in a reclamation act is too flimsy a basis upon which to erect a regional power empire, at least where the rules of construction applicable to acts creating municipal corporations are applicable.

Here we have a condemnation action brought by a municipal corporation, and a defense of ultra vires is imposed. The traditional view is that ultra vires can only be raised in a quo warranto action brought by the Attorney General on behalf of the State, and that to permit private individuals to raise the issue might lead to fraud or harassment. Harris v. Independence Gas Co., 76 Kan. 750, 92 P. 1123, 1126, 13 L.R. A.,N.S., 1171; Zinc Carbonate Co. v. First Natl. Bank, 103 Wis. 125, 79 N.W. 229.

In a railroad condemnation case the Louisiana court has said, "The defendant in this suit cannot be heard to invoke the rights of the municipality", Louisiana & N. W. R. Co. v. Nelson, 128 La. 390, 54 So. 917 (1911). See also Memphis & S. L. R. Co. v. Union Ry. Co., 116 Tenn. 500, 95 S.W. 1019, 1025 (1906). The lack of, or necessity for, a certificate of public convenience and necessity cannot be raised by a landowner in a condemnation action.

Colorado Central Power Co. v. City of Englewood, 89 F.2d 233, 235 (10th Cir. 1937).

In Arizona there is no need to strain to find a remedy for ultra vires acts. A.R.S. § 12-2041 authorizes the Attorney General to bring an action in quo warranto, "upon his own information or upon the verified complaint of any person * * * against any person who usurps * * * any franchise within this state." The gravamen of petitioners' complaint against the Salt River Project, though couched in terms of ultra vires, is that the Salt River Project has, without any authority, usurped a franchise to act as a public service corporation in the service area which it has carved out for itself. In essence, the defense is that the authorization to sell "surplus power" gives the needed authority. In my view the authorization to sell "surplus power" does not give it the necessary authority, but the issue is one ideally suited for proper presentation in quo warranto proceedings. No application has been made to the Attorney General to take action against the Project, and if he refused, the issue of whether he had sufficient grounds to refuse could be presented to a court in mandamus proceedings. Buggeln v. Doe, 9 Ariz. 81, 93, 78 P. 367; Duffield v. Ashurst, 12 Ariz. 360, 100 P. 820, appeal dismissed 223 U.S. 697, 32 S.Ct. 838, 56 L.Ed. 1262. This court has said with regard to the quo warranto

statutes that "the Legislature has provided a complete and ample remedy where there is a usurpation of any of the state's franchises." Faulkner v. Board of Sup'rs. of Gila County, 17 Ariz. 139, 145, 149 P. 382, 384.

It is true that ultra vires may be raised as a defense in proper cases by a municipal corporation, Dillon, supra, §§ 791, 792, 796, 1610–1611, but in other cases it may be estopped to do so. Zion's Sav. Bank & Trust Co. v. Tropic & East Fork Irr. Co., 102 Utah 101, 126 P.2d 1053. In some cases ultra vires may be raised in a taxpayer's action by analogy to the minority stockholders' action, Dillon, supra, §§ 1579–1581. City of Middlesboro v. Kentucky Utilities Co., 284 Ky. 833, 146 S.W.2d 48, in which the carrying out of a contract between the city and the Tennessee Valley Authority was enjoined as ultra vires, was a suit in which taxpayers joined. Taxpayers and a competing private power company joined as plaintiffs in McGuinn v. City of High Point, 217 N.C. 449, 8 S.E.2d 462, 128 A.L.R. 608, in which use of a license to construct a power dam granted by the Federal Power Commission and the acceptance of a grant from the Public Works Administration for the cost, was enjoined. Yadkin County v. City of High Point, 217 N.C. 462, 8 S.E.2d 470, in which it was held that county home and highway property already devoted to a public use, could not be con-

demned, was a companion case and followed McGuinn, in which the project had already been held to be ultra vires. Petitioners here are not taxpayers within the Salt River Agricultural Improvement District. Galloway v. Mitchell County Electric Membership Corp., 190 Ga. 428, 9 S.E. 2d 903, in which the doctrine of ultra vires was invoked to block a loan for a cold storage plant by an R.E.A. co-op, was a minority stockholders' action, specifically authorized by the Georgia statute.

There is no necessity for litigating the issue of ultra vires in this condemnation case, and good reason suggests that it not be permitted. The result would be to force this court, on the basis of an insufficient record, to decide this major matter of state policy.

This case is strikingly similar to Light v. City of Danville, 168 Va. 181, 198, 190 S.E. 276, 282. In that case opponents of a municipal power plant sought a policy decision condemning a scheme which involved federal co-operation in the construction of the plant, in a condemnation action involving a small tract of land. The Virginia court said:

"We shall not inquire into these economic or political theories, or the grounds of necessity or expediency upon which they are founded. * * *

"Such defenses are irrelevant and immaterial in this condemnation proceeding, and do not herein constitute proper defenses."

The multitude of cases where lack of public purpose has been successfully urged to block condemnation should be distinguished. If a condemnation is not for a public use it is unconstitutional, and no act of the legislature could cure the defect. See Dillon, supra, §§ 1031, 1033. It is self evident that a power transmission line is for a public purpose. Light v. City of Danville, 168 Va. 181, 190 S.E. 276; McCrady v. Western Farmers Electric Cooperative, 323 P.2d 356 (Okl.1958); State ex rel. Chelan Electric Co. v. Superior Court, 142 Wash. 270, 253 P. 115, 58 A.L.R. 779. Construction of this line cannot be blocked in this type of proceeding. The legislature can determine which public agency should operate it, or if it should be sold to a private agency, as well after it is constructed as before.

I point out that the fact that state lines are crossed in the proposed undertaking does not influence my view that the proposed expansion of the power activities of the Salt River Project is ultra vires. Where a municipal corporation is properly authorized to engage in the power business generally, it is immaterial if carrying out a legal contract requires it to cross a state line into another state. State ex rel. John-

son v. Consumers Public Power Dist., 143 Neb. 753, 10 N.W.2d 784, 152 A.L.R. 480, 492. A mine mouth operation in Colorado or New Mexico, in itself is no more objectionable than the purchase of coal in these states would be.

I agree with those sections of the majority opinion headed "Power of Eminent Domain", "Status of District as a Municipal Corporation", and "Equal Protection of the Laws."

For the foregoing reasons I concur in the result and to prevent further litigation commend the policy questions raised by this litigation to the legislature.

YALE McFATE, Superior Court Judge (specially concurring):

I concur in the majority holding that the District may lawfully construct the lines in question. However, I disagree with the reasons stated for such holding and I concur with the opinions expressed by Justice Bernstein that the exchange power to be transmitted over the petitioners' lands is not "surplus" power within the meaning of § 45–903, subsection A, paragraph 7 A.R.S.

I am unable to concur with either the opinion of the majority or with that of Justice Bernstein as to the status of the District in relation to its power activities outside its boundaries. The former, it seems, bestows on the District practically unlimited authority, whereas the latter leaves the District without any authority whatsoever, neither of which results were intended by the Legislature.

There was evidence in this record from which the trial judge could have found that the power to be brought in over the transmission lines in question is necessary for the purpose of providing electrical energy to the inhabitants of the area in which the District has extended its electric service lines, and in which it is presently serving.

The question presented to this court, in its simplest terms is, does the District have the authority, either express or implied, under Arizona law, to purchase and transmit additional power to take care of the increasing needs of the commercial business in the areas outside its boundaries in which it is now serving electricity.

I am aware of no law, statutory or otherwise, which will permit the District to transmit the large quantity of newly-acquired non-surplus electricity involved in this case and use any part of it for purposes other than that authorized within its boundaries under § 45–903, subsection A, paragraph 6 A.R.S. unless it be under some theory of·public utility law.

If the District has authority as a public utility to acquire non-surplus electric energy for extra-territorial distribution, that

authority must be expressed in the statute law under which it was created, or reasonably implied from those statutory powers. However, if it has express authority to establish by the use of its surplus power, a public utility business outside its boundaries, then it has implied authority to acquire additional power from any source, if *necessary* to satisfy the power requirements of the citizens in the area it serves. And the law which authorizes it to sell surplus power cannot be a limitation on this implied authority, for the reason that it is the basis for the initial authorization and establishment of the public service which in turn is justification for the implied authority to maintain that service. Let us now examine the statutory and case law in point to determine whether the foregoing principles are valid and applicable.

In City of Mesa v. Salt River Project Agri. Imp. & P. Dist., 92 Ariz. 91, 373 P.2d 722 (1962), this Court held that the District is a municipal corporation and a political subdivision of the state of unique character, adding:

"But whatever may be the District's exact status, plainly, the effect of selling electricity to the ultimate consumer at retail is to place the District in the position of engaging in business as a public utility for this is a business traditionally affected with public interest." 92 Ariz. 97, 373 P.2d at 726.

The court in that case also stated:

" * * * The District by its investment has committed itself to a public utility undertaking plainly accepting *the grant of the state to engage in that business.*" (Emphasis added). 92 Ariz. at 99, 373 P.2d at 728.

We are not here concerned with inquiry into the precise legal relationship between the District and its extra-territorial customers, for example, whether the District is legally obligated to provide them continuous, adequate and non-discriminatory service. We are not concerned with possible conflict between the District and any other public utility. We are here concerned with the character and extent of service actually being rendered and whether that service is ultra vires. The facts are not in dispute that the District has voluntarily inaugurated a public electric power service and is in fact engaged in a public utility business both within and outside its boundaries.

We held in Rubenstein Const. Co. v. Salt River Project Agr. Imp. & P. Dist., 76 Ariz. 402, 265 P.2d 455 (1953), that although the District was not a public service corporation subject to jurisdiction of the Corporation Commission, neverthe-

less it was·a municipal corporation and as such had authority to engage in a public utility business.

Under A.R.S. § 45–903, subsection A, paragraph 7 the District may sell its surplus power, without limitation as to the method of sale, and may construct and maintain the works useful for the purpose, either within or outside its boundaries. This provision is designated in the statute as one of the organizational *purposes* of the District, and constitutes an *express power* granted to it. In construing the nature and extent of this authority to sell surplus power outside the District and to build electric works useful for the purpose, we should ascertain its plain meaning and give effect to it. The provisions of the Agricultural Improvement District Act are to be liberally construed to the end that their objectives may be accomplished and justice promoted. Local 266, etc. v. Salt River Project Agr. Imp. & P. Dist., 78 Ariz. 30, 275 P.2d 393 (1954). Applying these rules of construction, it becomes evident that the District has express authority to sell surplus power outside its boundaries in any manner consistent with law, including sale by means of establishing a business enterprise devoted to public service.

At the time subsection A, paragraph 7 of § 45–903 A.R.S. was added to the District's powers, by amendment in 1936, the District's predecessor had established extra-territorial public utility service, of which fact the Legislature was fully aware. Almost twenty years later, the Legislature (Laws 1963, 1st sp. ses., ch. 1 § 1) encouraged the operation carried on by the District whereby it used its power revenues to defray costs of operation and for water conservation, being, at the time, fully cognizant of the nature and extent of its public utility operations. At no time has there been any legislative effort to curtail such activity or alter the *status quo ante*. This fact confirms the notion that the Legislature intended a liberal construction of the words "sale of surplus power" so as to include the public utility method of sale then being employed.

It appearing that (1) this court has held in City of Mesa and in Rubenstein, supra, that the District is empowered to act as a public utility, and, (2) the statute is broad enough to empower such activity outside the boundaries of the District, and (3) the District and its predecessor have for many years engaged in such activity within and without its boundaries, with tacit legislative approval, I conclude that in the conduct of such business it is *not* acting *ultra vires*.

The remaining question is, in the course of its extra-territorial business as a public utility, does the District have implied au-

thority to acquire power from sources other than its own generating facilities, to satisfy the increased demands of the public within reasonable reach of its service lines?

I find no statute which expressly denies it such authority. It would seem that absent express statutory limitation, the authority to acquire sufficient power to meet the requirements of the citizens residing within the territory being served by its lines is implicit in the authority of the District to carry on the business of serving power to the public. When a municipal corporation is authorized to exercise a power purely proprietary, the law leans to the theory that it has full power to perform it in the same efficient manner as a private concern would do. Gardner v. Industrial Commission, 72 Ariz. 274, 233 P.2d 833 (1951). Local 266, etc. v. Salt River Project, 78 Ariz. 30, 275 P.2d 393 (1954). The outright denial of such authority in this case would be a great public disservice, which could cause immeasurable harm and hardship to thousands of citizens dependent upon electric service from the District. There should be no such denial except for sound, legal and compelling reasons.

It seems doubtful that the grant of authority to sell to the public one of the present-day necessities of life would intentionally be limited in such manner that continuity of service would be dependent on the ability of the District to develop and *maintain* a constant and sufficient surplus, over and above its own requirements. Especially is this so in view of the fact that through the years the Salt River Valley has experienced continuous growth and development, and that the yearly and seasonal power requirements of the District are subject to change. Did the Legislature contemplate that the public service to be established by the District with its surplus energy would be turned on and off or curtailed intermittently, depending on District power needs and generating capacity? Did the Legislature intend that the citizens living within the area served by the District's lines be treated in this manner, when under similar circumstances other municipally operated utilities have ample authority to acquire the necessary electrical energy to satisfy customer demands? I believe not.

This court should determine that the District's powers in relation to sale of electrical energy, expressed and reasonably implied are as follows:

(1) Under A.R.S. § 45–903, subsection A, paragraph 6, the District may provide an electric public utility service within its boundaries, or otherwise provide power to the occupants of the lands therein.

(2) At such times as it generates surplus power it may sell the same in any manner consistent with law, including the extension of its public utility business outside its boundaries.

(3) Once it has established a public utility plant and established service outside its boundaries, it may provide adequate service to its customers in the area served, even though its generating facilities become incapable of producing sufficient surplus power to satisfy their needs.

(4) It may acquire such additional necessary power by purchase, or otherwise, and may construct lines useful for transmitting it to the ultimate consumer.

In view of the foregoing authorities and conclusions, it is evident that the transmission lines being constructed by the District are for a lawful purpose, and as I concur in the majority opinion dealing with the District's right of condemnation, I conclude that the order of the lower court should be affirmed.

Note: The Honorable Renz L. Jennings, former Justice, having disqualified himself, and the Honorable Ernest W. McFarland, Justice, not having participated in the hearing, the Honorable Yale McFate, Judge of the Superior Court, was called in to participate in the determination of this matter.